# BFP *v.* RESOLUTION TRUST CORPORATION, AS RECEIVER OF IMPERIAL FEDERAL SAVINGS ASSOCIATION, ET AL.

No. 92–1370.   Argued December 7, 1993—Decided May 23, 1994

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which BLACKMUN, STEVENS, and GINSBURG, JJ., joined, *post,* p. 549.

*Roy B. Woolsey* argued the cause for petitioner. With him on the briefs was *Ronald B. Coulombe.*

*Ronald J. Mann* argued the cause for respondent Resolution Trust Corporation. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Jeffrey P. Minear, Joseph Patchan, Jeffrey Ehrlich,* and *Janice Lynn Green.*

*Michael R. Sment* argued the cause and filed a brief for respondent Osborne et al.*

---

*Marian C. Nowell, Henry J. Sommer, Gary Klein, Neil Fogarty,* and *Philip Shuchman* filed a brief for Frank Allen et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Council of Life Insurance et al. by *Christopher F. Graham, James L. Cunningham,* and *Richard E. Barnsback;* for the California Trustee's Association et al. by *Phillip M. Adleson, Patric J. Kelly,* and *Duane W. Shewaga;*

JUSTICE SCALIA delivered the opinion of the Court.

This case presents the question whether the consideration received from a noncollusive, real estate mortgage foreclosure sale conducted in conformance with applicable state law conclusively satisfies the Bankruptcy Code's requirement that transfers of property by insolvent debtors within one year prior to the filing of a bankruptcy petition be in exchange for "a reasonably equivalent value." 11 U. S. C. § 548(a)(2).

I

Petitioner BFP is a partnership, formed by Wayne and Marlene Pedersen and Russell Barton in 1987, for the purpose of buying a home in Newport Beach, California, from Sheldon and Ann Foreman. Petitioner took title subject to a first deed of trust in favor of Imperial Savings Association (Imperial)[1] to secure payment of a loan of $356,250 made to the Pedersens in connection with petitioner's acquisition of the home. Petitioner granted a second deed of trust to the Foremans as security for a $200,000 promissory note. Subsequently, Imperial, whose loan was not being serviced, entered a notice of default under the first deed of trust and scheduled a properly noticed foreclosure sale. The foreclosure proceedings were temporarily delayed by the filing of an involuntary bankruptcy petition on behalf of petitioner. After the dismissal of that petition in June 1989, Imperial's

_____

for the Council of State Governments et al. by *Richard Ruda;* for the Federal Home Loan Mortgage Corporation et al. by *Dean S. Cooper, Roger M. Whelan, David F. B. Smith,* and *William E. Cumberland;* and for Jim Walter Homes, Inc., by *Lawrence A. G. Johnson.*

[1] Respondent Resolution Trust Corporation (RTC) acts in this case as receiver of Imperial Federal Savings Association (Imperial Federal), which was organized pursuant to a June 22, 1990, order of the Director of the Office of Thrift Supervision, and into which RTC transferred certain assets and liabilities of Imperial. The Director previously had appointed RTC as receiver of Imperial. For convenience we refer to all respondents other than RTC and Imperial as the private respondents.

foreclosure proceeding was completed at a foreclosure sale
on July 12, 1989. The home was purchased by respondent
Paul Osborne for $433,000.

In October 1989, petitioner filed for bankruptcy under
Chapter 11 of the Bankruptcy Code, 11 U. S. C. §§ 1101–1174.
Acting as a debtor in possession, petitioner filed a complaint
in Bankruptcy Court seeking to set aside the conveyance of
the home to respondent Osborne on the grounds that the
foreclosure sale constituted a fraudulent transfer under § 548
of the Code, 11 U. S. C. § 548. Petitioner alleged that the
home was actually worth over $725,000 at the time of the
sale to Osborne. Acting on separate motions, the Bank-
ruptcy Court dismissed the complaint as to the private
respondents and granted summary judgment in favor of
Imperial. The Bankruptcy Court found, *inter alia,* that the
foreclosure sale had been conducted in compliance with Cali-
fornia law and was neither collusive nor fraudulent. In an
unpublished opinion, the District Court affirmed the Bank-
ruptcy Court's granting of the private respondents' motion
to dismiss. A divided bankruptcy appellate panel affirmed
the Bankruptcy Court's entry of summary judgment for Im-
perial. 132 B. R. 748 (1991). Applying the analysis set
forth in *In re Madrid,* 21 B. R. 424 (Bkrtcy. App. Pan. CA9
1982), affirmed on other grounds, 725 F. 2d 1197 (CA9), cert.
denied, 469 U. S. 833 (1984), the panel majority held that a
"non-collusive and regularly conducted nonjudicial foreclo-
sure sale . . . cannot be challenged as a fraudulent conveyance
because the consideration received in such a sale establishes
'reasonably equivalent value' as a matter of law." 132 B. R.,
at 750.

Petitioner sought review of both decisions in the Court of
Appeals for the Ninth Circuit, which consolidated the ap-
peals. The Court of Appeals affirmed. *In re BFP,* 974
F. 2d 1144 (1992). BFP filed a petition for certiorari, which
we granted. 508 U. S. 938 (1993).

## II

Section 548 of the Bankruptcy Code, 11 U. S. C. § 548, sets forth the powers of a trustee in bankruptcy (or, in a Chapter 11 case, a debtor in possession) to avoid fraudulent transfers.[2] It permits to be set aside not only transfers infected by actual fraud but certain other transfers as well—so-called constructively fraudulent transfers. The constructive fraud provision at issue in this case applies to transfers by insolvent debtors. It permits avoidance if the trustee can establish (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U. S. C. § 548(a)(2)(A). It is the last of these four elements that presents the issue in the case before us.

Section 548 applies to any "transfer," which includes "foreclosure of the debtor's equity of redemption." 11 U. S. C. § 101(54) (1988 ed., Supp. IV). Of the three critical terms "reasonably equivalent value," only the last is defined: "value" means, for purposes of § 548, "property, or satisfaction or securing of a . . . debt of the debtor," 11 U. S. C.

---

[2] Title 11 U. S. C. § 548 provides in relevant part:

"(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

"(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

"(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

"(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . ."

§ 548(d)(2)(A). The question presented here, therefore, is whether the amount of debt (to the first and second lienholders) satisfied at the foreclosure sale (viz., a total of $433,000) is "reasonably equivalent" to the worth of the real estate conveyed. The Courts of Appeals have divided on the meaning of those undefined terms. In *Durrett* v. *Washington Nat. Ins. Co.*, 621 F. 2d 201 (1980), the Fifth Circuit, interpreting a provision of the old Bankruptcy Act analogous to § 548(a)(2), held that a foreclosure sale that yielded 57% of the property's fair market value could be set aside, and indicated in dicta that any such sale for less than 70% of fair market value should be invalidated. *Id.*, at 203–204. This "*Durrett* rule" has continued to be applied by some courts under § 548 of the new Bankruptcy Code. See *In re Littleton*, 888 F. 2d 90, 92, n. 5 (CA11 1989). In *In re Bundles*, 856 F. 2d 815, 820 (1988), the Seventh Circuit rejected the *Durrett* rule in favor of a case-by-case, "all facts and circumstances" approach to the question of reasonably equivalent value, with a *rebuttable* presumption that the foreclosure sale price is sufficient to withstand attack under § 548(a)(2). 856 F. 2d, at 824–825; see also *In re Grissom*, 955 F. 2d 1440, 1445–1446 (CA11 1992). In this case the Ninth Circuit, agreeing with the Sixth Circuit, see *In re Winshall Settler's Trust*, 758 F. 2d 1136, 1139 (CA6 1985), adopted the position first put forward in *In re Madrid*, 21 B. R. 424 (Bkrtcy. App. Pan. CA9 1982), affirmed on other grounds, 725 F. 2d 1197 (CA9), cert. denied, 469 U. S. 833 (1984), that the consideration received at a noncollusive, regularly conducted real estate foreclosure sale constitutes a reasonably equivalent value under § 548(a)(2)(A). The Court of Appeals acknowledged that it "necessarily part[ed] from the positions taken by the Fifth Circuit in *Durrett* . . . and the Seventh Circuit in *Bundles*." 974 F. 2d, at 1148.

In contrast to the approach adopted by the Ninth Circuit in the present case, both *Durrett* and *Bundles* refer to fair market value as the benchmark against which determination

of reasonably equivalent value is to be measured. In the context of an otherwise lawful mortgage foreclosure sale of real estate,[3] such reference is in our opinion not consistent with the text of the Bankruptcy Code. The term "fair market value," though it is a well-established concept, does not appear in §548. In contrast, §522, dealing with a debtor's exemptions, specifically provides that, for purposes of that section, "'value' means fair market value as of the date of the filing of the petition." 11 U. S. C. §522(a)(2). "Fair market value" also appears in the Code provision that defines the extent to which indebtedness with respect to an equity security is not forgiven for the purpose of determining whether the debtor's estate has realized taxable income. §346(j)(7)(B). Section 548, on the other hand, seemingly goes out of its way to avoid that standard term. It might readily have said "received less than fair market value in exchange for such transfer or obligation," or perhaps "less than a reasonable equivalent of fair market value." Instead, it used the (as far as we are aware) entirely novel phrase "reasonably equivalent value." "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another," *Chicago* v. *Environmental Defense Fund, ante,* at 338 (internal quotation marks omitted), and that presumption is even stronger when the omission entails the replacement of standard legal terminology with a neologism. One must suspect the language means that fair market value cannot—or at least cannot *always*—be the benchmark.

That suspicion becomes a certitude when one considers that market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value. "The market value of . . . a

---

[3] We emphasize that our opinion today covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different.

piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular ... piece of property." Black's Law Dictionary 971 (6th ed. 1990). In short, "fair market value" presumes market conditions that, by definition, simply do not obtain in the context of a forced sale. See, *e. g., East Bay Municipal Utility District* v. *Kieffer,* 99 Cal. App. 240, 255, 278 P. 476, 482 (1929), overruled on other grounds by *County of San Diego* v. *Miller,* 13 Cal. 3d 684, 532 P. 2d 139 (1975) (in bank); *Nevada Nat. Leasing Co.* v. *Hereford,* 36 Cal. 3d 146, 152, 680 P. 2d 1077, 1080 (1984) (in bank); *Guardian Loan Co.* v. *Early,* 47 N. Y. 2d 515, 521, 392 N. E. 2d 1240, 1244 (1979).

Neither petitioner, petitioner's *amici,* nor any federal court adopting the *Durrett* or the *Bundles* analysis has come to grips with this glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other. Market value cannot be the criterion of equivalence in the foreclosure-sale context.[4] The language of § 548(a)(2)(A) ("received less than a reasonably equivalent

---

[4] Our discussion assumes that the phrase "reasonably equivalent" means "approximately equivalent," or "roughly equivalent." One could, we suppose, torture it into meaning "as close to equivalent as can reasonably be expected"—in which event even a vast divergence from equivalent value would be permissible so long as there is good reason for it. On such an analysis, fair market value *could* be the criterion of equivalence, even in a forced-sale context; the forced sale would be the reason why gross inequivalence is nonetheless reasonable equivalence. Such word-gaming would deprive the criterion of all meaning. If "reasonably equivalent value" means only "as close to equivalent value as is reasonable," the statute might as well have said "reasonably infinite value."

value in exchange") requires judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of sale. An appraiser's reconstruction of "fair market value" could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But property that *must* be sold within those strictures is simply *worth less.* No one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques. And it is no more realistic to ignore that characteristic of the property (the fact that state foreclosure law permits the mortgagee to sell it at forced sale) than it is to ignore other price-affecting characteristics (such as the fact that state zoning law permits the owner of the neighboring lot to open a gas station).[5] Absent a clear statutory requirement to the contrary, we must assume the validity of this state-law regulatory background and take due account of its effect. "The existence and force and function of established

---

[5] We are baffled by the dissent's perception of a "patent" difference between zoning and foreclosure laws insofar as impact upon property value is concerned, *post,* at 557–558, n. 10. The only distinction we perceive is that the former constitute permanent restrictions upon use of the subject property, while the latter apply for a brief period of time and restrict only the manner of its sale. This difference says nothing about how significantly the respective regimes affect the property's value when they are operative. The dissent characterizes foreclosure rules as "merely procedural," and asserts that this renders them, unlike "substantive" zoning regulations, irrelevant in bankruptcy. We are not sure we agree with the characterization. But in any event, the cases relied on for this distinction all address creditors' attempts to claim the benefit of state rules of law (whether procedural or substantive) as property rights, in a bankruptcy proceeding. See *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 370–371 (1988); *Owen* v. *Owen,* 500 U. S. 305, 313 (1991); *United States* v. *Whiting Pools, Inc.,* 462 U. S. 198, 206–207, and nn. 14, 15 (1983). None of them declares or even intimates that state laws, procedural or otherwise, are irrelevant to prebankruptcy valuation questions such as that presented by § 548(a)(2)(A).

institutions of local government are always in the conscious-
ness of lawmakers and, while their weight may vary, they
may never be completely overlooked in the task of interpre-
tation." *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, 154
(1944). Cf. *Gregory* v. *Ashcroft,* 501 U. S. 452, 460–462
(1991).

There is another artificially constructed criterion we
might look to instead of "fair market price." One might
judge there to be such a thing as a "reasonable" or "fair"
forced-sale price. Such a conviction must lie behind the
*Bundles* inquiry into whether the state foreclosure proceed-
ings "were calculated . . . to return to the debtor-mortgagor
his equity in the property." 856 F. 2d, at 824. And perhaps
that is what the courts that follow the *Durrett* rule have in
mind when they select 70% of fair market value as the outer
limit of "reasonably equivalent value" for forecloseable prop-
erty (we have no idea where else such an arbitrary percent-
age could have come from). The problem is that such judg-
ments represent policy determinations that the Bankruptcy
Code gives us no apparent authority to make. How closely
the price received in a forced sale is likely to approximate
fair market value depends upon the terms of the forced
sale—how quickly it may be made, what sort of public notice
must be given, etc. But the terms for foreclosure sale are
not *standard.* They vary considerably from State to State,
depending upon, among other things, how the particular
State values the divergent interests of debtor and creditor.
To specify a federal "reasonable" foreclosure-sale price is to
extend federal bankruptcy law well beyond the traditional
field of fraudulent transfers, into realms of policy where it
has not ventured before. Some sense of history is needed
to appreciate this.

The modern law of fraudulent transfers had its origin in
the Statute of 13 Elizabeth, which invalidated "covinous and
fraudulent" transfers designed "to delay, hinder or defraud
creditors and others." 13 Eliz., ch. 5 (1570). English courts

soon developed the doctrine of "badges of fraud": proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. See *Twyne's Case,* 3 Coke Rep. 80b, 76 Eng. Rep. 809 (K. B. 1601); O. Bump, Fraudulent Conveyances: A Treatise upon Conveyances Made by Debtors to Defraud Creditors 31–60 (3d ed. 1882). Every American bankruptcy law has incorporated a fraudulent transfer provision; the 1898 Act specifically adopted the language of the Statute of 13 Elizabeth. Bankruptcy Act of July 1, 1898, ch. 541, § 67(e), 30 Stat. 564–565.

The history of foreclosure law also begins in England, where courts of chancery developed the "equity of redemption"—the equitable right of a borrower to buy back, or redeem, property conveyed as security by paying the secured debt on a later date than "law day," the original due date. The courts' continued expansion of the period of redemption left lenders in a quandary, since title to forfeited property could remain clouded for years after law day. To meet this problem, courts created the equitable remedy of foreclosure: after a certain date the borrower would be forever foreclosed from exercising his equity of redemption. This remedy was called strict foreclosure because the borrower's entire interest in the property was forfeited, regardless of any accumulated equity. See G. Glenn, 1 Mortgages 3–18, 358–362, 395–406 (1943); G. Osborne, Mortgages 144 (2d ed. 1970). The next major change took place in 19th-century America, with the development of foreclosure by sale (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure. *Id.,* at 661–663; Glenn, *supra,* at 460–462, 622. Since then, the States have created diverse networks of judicially and legislatively crafted rules governing the foreclosure process, to achieve what each of them considers the proper balance between the

needs of lenders and borrowers. All States permit judicial foreclosure, conducted under direct judicial oversight; about half of the States also permit foreclosure by exercising a private power of sale provided in the mortgage documents. See Zinman, Houle, & Weiss, Fraudulent Transfers According to Alden, Gross and Borowitz: A Tale of Two Circuits, 39 Bus. Law. 977, 1004–1005 (1984). Foreclosure laws typically require notice to the defaulting borrower, a substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures. Many States require that the auction be conducted by a government official, and some forbid the property to be sold for less than a specified fraction of a mandatory presale fair-market-value appraisal. See *id.*, at 1002, 1004–1005; Osborne, *supra*, at 683, 733–735; G. Osborne, G. Nelson, & D. Whitman, Real Estate Finance Law 9, 446–447, 475–477 (1979). When these procedures have been followed, however, it is "black letter" law that mere inadequacy of the foreclosure sale price is no basis for setting the sale aside, though it may be set aside (*under state foreclosure law,* rather than fraudulent transfer law) if the price is so low as to "shock the conscience or raise a presumption of fraud or unfairness." Osborne, Nelson, & Whitman, *supra*, at 469; see also *Gelfert* v. *National City Bank of N. Y.*, 313 U. S. 221, 232 (1941); *Ballentyne* v. *Smith*, 205 U. S. 285, 290 (1907).

Fraudulent transfer law and foreclosure law enjoyed over 400 years of peaceful coexistence in Anglo-American jurisprudence until the Fifth Circuit's unprecedented 1980 decision in *Durrett*. To our knowledge no prior decision had ever applied the "grossly inadequate price" badge of fraud under fraudulent transfer law to set aside a foreclosure sale.[6] To say that the "reasonably equivalent value" language in

---

[6] The only case cited by *Durrett* in support of its extension of fraudulent transfer doctrine, *Schafer* v. *Hammond*, 456 F. 2d 15 (CA10 1972), involved a direct sale, not a foreclosure.

the fraudulent transfer provision of the Bankruptcy Code requires a foreclosure sale to yield a certain minimum price beyond what state foreclosure law requires, is to say, in essence, that the Code has adopted *Durrett* or *Bundles.* Surely Congress has the power pursuant to its constitutional grant of authority over bankruptcy, U. S. Const., Art. I, § 8, cl. 4, to disrupt the ancient harmony that foreclosure law and fraudulent conveyance law, those two pillars of debtor-creditor jurisprudence, have heretofore enjoyed. But absent clearer textual guidance than the phrase "reasonably equivalent value"—a phrase entirely compatible with pre-existing practice—we will not presume such a radical departure. See *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 380 (1988); *Midlantic Nat. Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494, 501 (1986); cf. *United States* v. *Texas,* 507 U. S. 529, 534 (1993) (statutes that invade common law must be read with presumption favoring retention of long-established principles absent evident statutory purpose to the contrary).[7]

---

[7] We are unpersuaded by petitioner's argument that the 1984 amendments to the Bankruptcy Code codified the *Durrett* rule. Those amendments expanded the definition of "transfer" to include "foreclosure of the debtor's equity of redemption," 11 U. S. C. § 101(54) (1988 ed., Supp. IV), and added the words "voluntarily or involuntarily" as modifiers of the term "transfer" in § 548(a). The first of these provisions establishes that foreclosure sales fall within the general definition of "transfers" that may be avoided under several statutory provisions, including (but not limited to) § 548. See § 522(h) (transfers of exempt property), § 544 (transfers voidable under state law), § 547 (preferential transfers), § 549 (postpetition transfers). The second of them establishes that a transfer may be avoided as fraudulent even if it was against the debtor's will. See *In re Madrid,* 725 F. 2d 1197, 1199 (CA9 1984) (preamendment decision holding that a foreclosure sale is not a "transfer" under § 548). Neither of these consequences has any bearing upon the meaning of "reasonably equivalent value" in the context of a foreclosure sale.

Nor does our reading render these amendments "superfluous," as the dissent contends, *post,* at 555. Prior to 1984, it was at least open to ques-

Federal statutes impinging upon important state interests "cannot . . . be construed without regard to the implications of our dual system of government. . . . [W]hen the Federal Government takes over . . . local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 539–540 (1947), quoted in *Kelly* v. *Robinson*, 479 U. S. 36, 49–50, n. 11 (1986). It is beyond question that an essential state interest is at issue here: We have said that "the general welfare of society is involved in the security of the titles to real estate" and the power to ensure that security "inheres in the very nature of [state] government." *American Land Co.* v. *Zeiss*, 219 U. S. 47, 60 (1911). Nor is there any doubt that the interpretation urged by petitioner would have a profound effect upon that interest: The title of every piece of realty purchased at foreclosure would be under a federally created cloud. (Already, title insurers have reacted to the *Durrett* rule by including specially crafted exceptions from coverage in many policies issued for properties purchased at foreclosure sales. See, *e. g.*, L. Cherkis & L. King, Collier Real Estate Transactions and the Bankruptcy Code, pp. 5–18 to 5–19 (1992).) To displace traditional state regulation in such a manner, the federal statutory purpose must be "clear and manifest," *English* v. *General Elec. Co.*, 496 U. S. 72, 79 (1990). Cf. *Gregory* v. *Ashcroft*, 501 U. S., at 460–461.[8] Otherwise, the Bankruptcy

---

tion whether § 548 could be used to invalidate even a *collusive* foreclosure sale, see *Madrid, supra*, at 1204 (Farris, J., concurring). It is no superfluity for Congress to clarify what had been at best unclear, which is what it did here by making the provision apply to involuntary as well as voluntary transfers and by including foreclosures within the definition of "transfer." See *infra*, at 545–546.

[8] The dissent criticizes our partial reliance on *Gregory* because the States' authority to "defin[e] and adjus[t] the relations between debtors and creditors . . . [cannot] fairly be called essential to their indepen-

Code will be construed to adopt, rather than to displace, pre-existing state law. See *Kelly, supra,* at 49; *Butner* v. *United States,* 440 U. S. 48, 54–55 (1979); *Vanston Bondholders Protective Comm.* v. *Green,* 329 U. S. 156, 171 (1946) (Frankfurter, J., concurring).

For the reasons described, we decline to read the phrase "reasonably equivalent value" in § 548(a)(2) to mean, in its application to mortgage foreclosure sales, either "fair market value" or "fair foreclosure price" (whether calculated as a percentage of fair market value or otherwise). We deem, as the law has always deemed, that a fair and proper price, or a "reasonably equivalent value," for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with.

This conclusion does not render § 548(a)(2) superfluous, since the "reasonably equivalent value" criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context. Indeed, § 548(a)(2) will even continue to be an exclusive means of invalidating some foreclosure sales. Although *collusive* foreclosure sales are likely subject to attack under § 548(a)(1), which authorizes the trustee to avoid transfers "made . . . with actual intent to hinder, delay, or defraud" creditors, that provision may not reach foreclosure sales that, while not intentionally fraudulent, nevertheless fail to comply with all governing state laws. Cf. 4 L. King, Collier on Bankruptcy ¶ 548.02, p. 548–35 (15th ed. 1993) (contrasting subsections (a)(1) and (a)(2)(A) of § 548). Any irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law deprives the sale

---

dence." *Post,* at 565, n. 17 (internal quotation marks omitted). This ignores the fact that it is not state authority over debtor-creditor law *in general* that is at stake in this case, but the essential sovereign interest in the security and stability of title to land. See *American Land Co.* v. *Zeiss,* 219 U. S. 47, 60 (1911).

price of its conclusive force under § 548(a)(2)(A), and the transfer may be avoided if the price received was not reasonably equivalent to the property's actual value at the time of the sale (which we think would be the price that would have been received if the foreclosure sale had proceeded according to law).

## III

A few words may be added in general response to the dissent. We have no quarrel with the dissent's assertion that where the "meaning of the Bankruptcy Code's text is itself clear," *post*, at 566, its operation is unimpeded by contrary state law or prior practice. Nor do we contend that Congress must override historical state practice "expressly or not at all." *Post*, at 565. The Bankruptcy Code can of course override by implication when the implication is unambiguous. But where the intent to override is doubtful, our federal system demands deference to long-established traditions of state regulation.

The dissent's insistence that here no doubt exists—that our reading of the statute is "in derogation of the *straightforward language* used by Congress," *post*, at 549 (emphasis added)—does not withstand scrutiny. The problem is not that we disagree with the dissent's proffered "plain meaning" of § 548(a)(2)(A) ("[T]he bankruptcy court must compare the price received by the insolvent debtor and the worth of the item when sold and set aside the transfer if the former was substantially ('[un]reasonabl[y]') 'less than' the latter," *post*, at 552)—which indeed echoes our own framing of the question presented ("whether the amount of debt . . . satisfied at the foreclosure sale . . . is 'reasonably equivalent' to the worth of the real estate conveyed," *supra*, at 536). There is no doubt that this provision directs an inquiry into the relationship of the value received by the debtor to the worth of the property transferred. The problem, however, as any "ordinary speaker of English would have no difficulty grasping," *post*, at 552, is that this highly generalized re-

formulation of the "plain meaning" of "reasonably equivalent value" continues to leave unanswered the one question central to this case, wherein the ambiguity lies: *What is a foreclosed property worth?* Obviously, until that is determined, we cannot know whether the value received in exchange for foreclosed property is "reasonably equivalent." We have considered three (not, as the dissent insists, only two, see *post*, at 549) possible answers to this question—fair market value, *supra*, at 536–540, reasonable forced-sale price, *supra*, at 540, and the foreclosure-sale price itself—and have settled on the last. We would have expected the dissent to opt for one of the other two, or perhaps even to concoct a fourth; but one searches JUSTICE SOUTER's opinion in vain for any alternative response to the question of the transferred property's worth. Instead, the dissent simply reiterates the "single meaning" of "reasonably equivalent value" (with which we entirely agree): "[A] court should discern the 'value' of the property transferred and determine whether the price paid was, under the circumstances, 'less than reasonabl[e].'" *Post*, at 559. Well and good. But what *is* the "value"? The dissent has no response, evidently thinking that, in order to establish that the law is clear, it suffices to show that "the eminent sense of the natural reading," *post*, at 565, provides an unanswered question.

Instead of answering the question, the dissent gives us hope that someone else will answer it, exhorting us "to believe that [bankruptcy courts], familiar with these cases (and with local conditions) as we are not, will give ["reasonably equivalent value"] sensible content in evaluating particular transfers on foreclosure." *Post*, at 560. While we share the dissent's confidence in the capabilities of the United States Bankruptcy Courts, it is the proper function of *this* Court to give "sensible content" to the provisions of the United States Code. It is surely the case that bankruptcy "courts regularly make . . . determinations about the 'reasonably equivalent value' of assets transferred through other

means than foreclosure sales." *Post*, at 560. But in the vast majority of those cases, they can refer to the traditional common-law notion of fair market value as the benchmark. As we have demonstrated, this generally useful concept simply has no application in the foreclosure-sale context, *supra*, at 536–540.

Although the dissent's conception of what constitutes a property's "value" is unclear, it does *seem* to take account of the fact that the property is subject to forced sale. The dissent refers, for example, to a reasonable price "under the circumstances," *post*, at 559, and to the "worth of the item *when sold*," *post*, at 552 (emphasis added). But just as we are never told how the broader question of a property's "worth" is to be answered, neither are we informed how the lesser included inquiry into the impact of forced sale is to be conducted. Once again, we are called upon to have faith that bankruptcy courts will be able to determine whether a property's foreclosure-sale price falls unreasonably short of its "optimal value," *post*, at 559, whatever that may be. This, the dissent tells us, is the statute's plain meaning.

We take issue with the dissent's characterization of our interpretation as carving out an "exception" for foreclosure sales, *post*, at 549, or as giving "two different and inconsistent meanings," *post*, at 557, to "reasonably equivalent value." As we have emphasized, the inquiry under § 548(a)(2)(A)—whether the debtor has received value that is substantially comparable to the worth of the transferred property—is the same for all transfers. But as we have also explained, the fact that a piece of property is legally subject to forced sale, like any other fact bearing upon the property's use or alienability, necessarily affects its worth. *Unlike* most other legal restrictions, however, foreclosure has the effect of completely redefining the market in which the property is offered for sale; normal free-market rules of exchange are replaced by the far more restrictive rules governing forced sales. Given this altered reality, and the concomitant inutil-

ity of the normal tool for determining what property is worth (fair market value), the only legitimate evidence of the property's value at the time it is sold is the foreclosure-sale price itself.

\* \* \*

For the foregoing reasons, the judgment of the Court of Appeals for the Ninth Circuit is

*Affirmed.*

JUSTICE SOUTER, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE GINSBURG join, dissenting.

The Court today holds that by the terms of the Bankruptcy Code Congress intended a peppercorn paid at a noncollusive and procedurally regular foreclosure sale to be treated as the "reasonabl[e] equivalent" of the value of a California beachfront estate. Because the Court's reasoning fails both to overcome the implausibility of that proposition and to justify engrafting a foreclosure-sale exception onto 11 U. S. C. § 548(a)(2)(A), in derogation of the straightforward language used by Congress, I respectfully dissent.

I

A

The majority presents our task of giving meaning to § 548(a)(2)(A) in this case as essentially entailing a choice between two provisions that Congress might have enacted, but did not. One would allow a bankruptcy trustee to avoid a recent foreclosure-sale transfer from an insolvent debtor whenever anything less than fair market value was obtained, while the second would limit the avoidance power to cases where the foreclosure sale was collusive or had failed to comply with state-prescribed procedures. The Court then argues that, given the unexceptionable proposition that forced sales rarely yield as high a price as sales held under ideal, "market" conditions, Congress's "omission" from

§ 548(a)(2)(A) of the phrase "fair market value" means that the latter, narrowly procedural reading of § 548(a)(2)(A) is the preferable one.

If those in fact were the interpretive alternatives, the majority's choice might be a defensible one.[1] The first, equating "reasonably equivalent value" at a foreclosure sale with "fair market value" has little to recommend it. Forced-sale prices may not be (as the majority calls them) the "very *antithesis*" of market value, see *ante*, at 537, but they fail to bring in what voluntary sales realize, and rejecting such a

---

[1] I note, however, two preliminary embarrassments: first, the gloss on § 548(a)(2)(A) the Court embraces is less than entirely hypothetical. In the course of amending the Bankruptcy Code in 1984, see *infra*, at 554, Congress considered, but did not enact, an amendment that said precisely what the majority now says the current provision means, *i. e.*, that the avoidance power is confined to foreclosures involving collusion or procedural irregularity. See S. 445, 98th Cong., 1st Sess., § 360 (1983). Even if one is careful not to attach too much significance to such a legislative nonoccurrence, it surely cautions against undue reliance on a different, entirely speculative congressional "omission." See *ante*, at 537 (the statute "seemingly goes out of its way to avoid" using "fair market value"); but cf. *ante*, at 545 (reasonably equivalent value will "continue" to have a meaning "similar to fair market value" outside the foreclosure-sale context).

In this case, such caution would be rewarded. While the assertedly "standard," *ante*, at 537, phrase "fair market value" appears in more than 150 distinct provisions of the Tax Code, it figures in only two Bankruptcy Code provisions, one of which is entitled, suggestively, "Special tax provisions." See 11 U. S. C. § 346. The term of choice in the bankruptcy setting seems to be "value," unadorned and undefined, which appears in more than 30 sections of the Bankruptcy Code, but which is, with respect to many of them, read to mean "fair market value." See also § 549(c) ("present fair equivalent value"); § 506(a) ("value [is to] be determined in light of the purpose of the valuation and of the proposed disposition or use of such property"); S. Rep. No. 95–989, p. 54 (1978) ("[M]atters [of valuation under § 361] are left to case-by-case interpretation and development. . . . Value [does not] mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes . . ."). To the extent, therefore, that this negative implication supplies ground to "suspect," see *ante*, at 537, that Congress could not have meant what the statute says, such suspicion is misplaced.

reading of the statute is as easy as statutory interpretation is likely to get. On the majority's view, laying waste to this straw man necessitates accepting as adequate value whatever results from noncollusive adherence to state foreclosure requirements. Because properties are "simply *worth less*," *ante*, at 539, on foreclosure sale, the Court posits, they must have been "worth" whatever price was paid. That, however, is neither a plausible interpretation of the statute, nor its only remaining alternative reading.[2]

---

[2] The majority's statutory argument depends similarly heavily on the success of its effort to relegate "fair market value" to complete pariah status. But it is no short leap from the (entirely correct) observation that a property's fair market value will not be dispositive of whether "less than a reasonably equivalent value" was obtained on foreclosure to the assertion that market value has "no applicability," *ante*, at 537, or *is not "legitimate evidence*," *ante*, at 549 (emphasis added), of whether the statutory standard was met. As is explored more fully *infra*, the assessed value of a parcel of real estate at the time of foreclosure sale is not to be ignored. On the contrary, that figure plainly is relevant to the Bankruptcy Code determination, both because it provides a proper measure of the rights received by the transferee and because it is indicative of the extent of the debtor's equity in the property, an asset which, but for the prebankruptcy transfer under review, would have been available to the bankruptcy estate, see *infra*, at 562–565.

It is also somewhat misleading, similarly, to suggest that "[n]o one would pay as much," *ante*, at 539, for a foreclosed property as he would for the same real estate purchased under leisurely, market conditions. Buyers no doubt hope for bargains at foreclosure sales, but an investor with a million dollars cash in his pocket might be ready to pay "as much" for a desired parcel of property on forced sale, at least if a rival, equally determined millionaire were to appear at the same auction. The principal reason such sales yield low prices is not so much that the properties become momentarily *"worth less*," *ibid.* (on the contrary, foreclosure-sale purchasers receive a bundle of rights essentially similar to what they get when they buy on the market) or that foreclosing mortgagees are under the compulsion of state law to make no more than the most desultory efforts to encourage higher bidding, but rather that such free-spending millionaires are in short supply, and those who do exist are unlikely to read the fine print which fills the "legal notice" columns of their morning newspaper. Nor, similarly, is market value justly known as the "antithesis" of

The question before the Court is whether the price received at a foreclosure sale after compliance with state procedural rules in a noncollusive sale must be treated conclusively as the "reasonably equivalent value" of the mortaged property and in answering that question, the words and meaning of § 548(a)(2)(A) are plain. See *Patterson* v. *Shumate*, 504 U. S. 753, 760 (1992) (party seeking to defeat plain meaning of Bankruptcy Code text bears an "exceptionally heavy burden") (internal quotation marks omitted); *Perrin* v. *United States*, 444 U. S. 37, 42 (1979) (statutory words should be given their ordinary meaning). A trustee is authorized to avoid certain recent prebankruptcy transfers, including those on foreclosure sales, that a bankruptcy court determines were not made in exchange for "a reasonably equivalent value." Although this formulation makes no pretense to mathematical precision, an ordinary speaker of English would have no difficulty grasping its basic thrust: the bankruptcy court must compare the price received by the insolvent debtor and the worth of the item when sold and set aside the transfer if the former was substantially ("[un]reasonabl[y]") "less than" the latter.[3] Nor would any ordinary English speaker, concerned to determine whether a foreclosure sale was collusive or procedurally irregular (an enquiry going exclusively to the process by which a transaction was consummated), direct an adjudicator, as the Court now holds Congress did, to ascertain whether the sale had realized "less than a reasonably equivalent value" (an enquiry described in quintessentially substantive terms).[4]

foreclosure-sale price, for the important (if intuitive) reason that properties with higher market values can be expected to sell for more on foreclosure.

[3] Indeed, it is striking that this is what the Court says the statute (probably) does mean, with respect to almost every transfer other than a sale of property upon foreclosure. See *ante*, at 545.

[4] The Court protests, *ante*, at 546, that its formulation, see *ante*, at 536, deviates only subtly from the reading advanced here and purports not to disagree that the statute compels an enquiry "into the relationship of the

Closer familiarity with the text, structure, and history of the disputed provision (and relevant amendments) confirms the soundness of the plain reading. Before 1984, the question whether foreclosure sales fell within bankruptcy courts' power to set aside transfers for "too little in return" was, potentially, a difficult one. Then, it might plausibly have been contended that § 548 was most concerned with "fraudulent" conduct by debtors on the brink of bankruptcy, misbehavior unlikely to be afoot when an insolvent debtor's property is sold, against his wishes, at foreclosure.[5] Indeed, it could further have been argued, again consonantly with the text of the earlier version of the Bankruptcy Code, that Congress had not understood foreclosure to involve a "transfer" within the ambit of § 548, see, e. g., Abramson v. Lakewood Bank & Trust Co., 647 F. 2d 547, 549 (CA5 1981) (Clark, J.,

---

value received and the worth of the property transferred," ante, at 546. Reassuring as such carefully chosen words may sound, they cannot obscure the fact that the "comparison" the majority envisions is an empty ritual. See n. 10, infra.

[5] The Court notes correctly that fraudulent conveyance laws were directed first against insolvent debtors' passing assets to friends or relatives, in order to keep them beyond their creditors' reach (the proverbial "Elizabethan deadbeat who sells his sheep to his brother for a pittance," see Baird & Jackson, Fraudulent Conveyance Law and Its Proper Domain, 38 Vand. L. Rev. 829, 852 (1985)), and then later against conduct said to carry the "badges" of such misconduct, but bankruptcy law had, well before 1984, turned decisively away from the notion that the debtor's state of mind, and not the objective effects on creditors, should determine the scope of the avoidance power. Thus, the 1938 Chandler Act, Bankruptcy Revision, provided that a transfer could be set aside without proving any intent to "hinder, delay, or defraud," provided that the insolvent debtor obtained less than "fair consideration" in return, see 11 U. S. C. § 107(d)(2) (1976), and the 1978 Bankruptcy Code eliminated scrutiny of the transacting parties' "good faith." Cf. 11 U. S. C. § 107(d)(1)(e) (1976). At the time when bankruptcy law was more narrowly concerned with debtors' turpitude, moreover, the available "remedies" were strikingly different, as well. See, e. g., 21 Jac. I., ch. 19, § 6 (1623), 4 Statutes of the Realm 1228 (insolvent debtor who fraudulently conceals assets is subject to have his ear nailed to pillory and cut off).

dissenting) (Bankruptcy Act case), cert. denied, 454 U. S. 1164 (1982), on the theory that the "transfer" from mortgagor to mortgagee occurs, once and for all, when the security interest is first created. See generally *In re Madrid,* 725 F. 2d 1197 (CA9), cert. denied, 469 U. S. 833 (1984).

In 1984, however, Congress pulled the rug out from under these previously serious arguments, by amending the Code in two relevant respects. See Bankruptcy Amendments and Federal Judgeship Act of 1984, §§ 401(1), 463(a), 98 Stat. 366, 378. One amendment provided expressly that "involuntar[y]" transfers are no less within the trustee's § 548 avoidance powers than "voluntar[y]" ones, and another provided that the "foreclosure of the debtor's equity of redemption" itself is a "transfer" for purposes of bankruptcy law. See 11 U. S. C. § 101(54) (1988 ed., Supp. IV).[6] Thus, whether or not one believes (as the majority seemingly does not) that foreclosure sales rightfully belong within the historic domain of "fraudulent conveyance" law, that is exactly where Congress has now put them, cf. *In re Ehring,* 900 F. 2d 184, 187 (CA9 1990), and our duty is to give effect to these new amendments, along with every other clause of the Bankruptcy Code. See, *e. g., United States* v. *Nordic Village, Inc.,* 503 U. S. 30, 36 (1992); *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 374–375 (1988); see also *Dewsnup* v. *Timm,* 502 U. S. 410, 426 (1992) (SCALIA, J., dissenting). The Court's attempt to escape the

---

[6] As noted at n. 1, *supra,* an earlier version of the Senate bill contained a provision that would have added to § 548 the conclusive presumption the Court implies here. See S. 445, 98th Cong., 1st Sess., § 360 (1983) ("A secured party or third party purchaser who obtains title to an interest of the debtor in property pursuant to a good faith prepetition foreclosure, power of sale, or other proceeding or provision of nonbankruptcy law permitting or providing for the realization of security upon default of the borrower under a mortgage, deed of trust, or other security agreement takes for reasonably equivalent value within the meaning of this section"). The provision was deleted from the legislation enacted by Congress.

plain effect of § 548(a)(2)(A) opens it to some equally plain objections.

The first and most obvious of these objections is the very enigma of the Court's reading. If a property's "value" is conclusively presumed to be whatever it sold for, the "less than reasonabl[e] equivalen[ce]" question will never be worth asking, and the bankruptcy avoidance power will apparently be a dead letter in reviewing real estate foreclosures. Cf. 11 U. S. C. § 361(3) ("indubitable equivalent").[7] The Court answers that the section is not totally moribund: it still furnishes a way to attack collusive or procedurally deficient real property foreclosures, and it enjoys a vital role in authorizing challenges to other transfers than those occurring on real estate foreclosure. The first answer, however, just runs up against a new objection. If indeed the statute fails to reach noncollusive, procedurally correct real estate foreclosures, then the recent amendments discussed above were probably superfluous. There is a persuasive case that collusive or seriously irregular real estate sales were already subject to avoidance in bankruptcy, see, e. g., In re Worcester, 811 F. 2d 1224, 1228, 1232 (CA9 1987) (interpreting § 541(a)), and neither the Court nor the respondents and their amici identify any specific case in which a court pronounced itself powerless to avoid a collusive foreclosure sale. But cf. Madrid, supra, at 1204 (Farris, J., concurring). It would seem peculiar,

---

[7] Evidently, many States take a less Panglossian view than does the majority about the prices paid at sales conducted in accordance with their prescribed procedures. If foreclosure-sale prices truly represented what properties are "worth," ante, at 539, or their "fair and proper price," ante, at 545, it would stand to reason that deficiency judgments would be awarded simply by calculating the difference between the debt owed and the "value," as established by the sale. Instead, in those jurisdictions permitting creditors to seek deficiency judgments it is quite common to require them to show that the foreclosure price roughly approximated the property's (appraised) value. See, e. g., Tex. Prop. Code Ann. §§ 51.003–51.005 (Supp. 1992); see generally Gelfert v. National City Bank of N. Y., 313 U. S. 221 (1941); cf. id., at 233 ("[T]he price which property commands at a forced sale may be hardly even a rough measure of its value").

then, that for no sound reason, Congress would have tinkered with these closely watched sections of the Bankruptcy Code, for the sole purpose of endowing bankruptcy courts with authority that had not been found wanting in the first place.[8]

The Court's second answer to the objection that it renders the statute a dead letter is to remind us that the statute applies to all sorts of transfers, not just to real estate foreclosures, and as to all the others, the provision enjoys great vitality, calling for true comparison between value received for the property and its "reasonably equivalent value." (Indeed, the Court has no trouble acknowledging that something "similar to" fair market value may supply the benchmark of reasonable equivalence when such a sale is not initiated by a mortgagee, *ante*, at 545.) This answer, however, is less tenable than the first. A common rule of con-

---

[8] That is not the only aspect of the majority's approach that is hard to square with the amended text. By redefining "transfer" in § 101, Congress authorized the trustee to avoid any "foreclosure of the equity of redemption" for "less than a reasonably equivalent value." In light of the fact, see, *e. g.*, Lifton, Real Estate in Trouble: Lender's Remedies Need an Overhaul, 31 Bus. Law 1927, 1937 (1976), that most foreclosure properties are sold (at noncollusive and procedurally unassailable sales, we may presume) for the precise amount of the outstanding indebtedness, when some (but by no means all) are worth more, see generally Wechsler, Through the Looking Glass: Foreclosure by Sale as *De Facto* Strict Foreclosure— An Empirical Study of Mortgage Foreclosure and Subsequent Resale, 70 Cornell L. Rev. 850 (1985), it seems particularly curious that Congress would amend a statute to recognize that a debtor "transfers" an "interest in property," when the equity of redemption is foreclosed, fully intending that the "reasonably equivalent value" of that interest would, in the majority of cases, be presumed conclusively to be zero.

To the extent that the Court believes the amended § 548(a)(2)(A) to be addressed to "collusive" sales, meanwhile, a surprisingly indirect means was chosen. Cf. 11 U. S. C. § 363(n) (authorizing trustee avoidance of postpetition sale, or, in the alternative, recovery of the difference between the "value" of the property and the "sale price," when the "sale price was controlled by an agreement"). Cf. *ante*, at 537 (citing *Chicago* v. *Environmental Defense Fund*, *ante*, at 338).

struction calls for a single definition of a common term occurring in several places within a statute, see *Bray v. Alexandria Women's Health Clinic,* 506 U. S. 263, 283 (1993); *Dewsnup v. Timm,* 502 U. S., at 422 (SCALIA, J., dissenting) (" '[N]ormal rule[s] of statutory construction'" require that "identical words *[used] in the same section of the same enactment*" must be given the same effect) (emphasis in original), and the case for different definitions within a single text is difficult to make, cf. *Bray, supra,* at 292 (SOUTER, J., concurring in part). But to give a single term two different and inconsistent meanings (one procedural, one substantive) for a single occurrence is an offense so unlikely that no common prohibition has ever been thought necessary to guard against it.[9] Cf. *Owen v. Owen,* 500 U. S. 305, 313 (1991) (declining to "create a distinction [between state and federal exemptions] that the words of the statute do not contain"); *Union Bank v. Wolas,* 502 U. S. 151, 162 (1991) (the "statutory text . . . makes no distinction between short-term debt and long-term debt"). Unless whimsy is attributed to Congress, the term in question cannot be exclusively procedural in one class of cases and entirely substantive in all others. To be sure, there are real differences between sales on mortgage foreclosures and other transfers, as Congress no doubt understood, but these differences may be addressed simply and consistently with the statute's plain meaning.[10]

---

[9] Indeed, the Court candidly acknowledges that the proliferation of meanings may not stop at two: not only does "reasonably equivalent value" mean one thing for foreclosure sales and another for other transfers, but tax sales and other transactions may require still other, unspecified "benchmark[s]." See *ante,* at 537, and n. 3.

[10] The Court's somewhat mischievous efforts to dress its narrowly procedural gloss in respectable, substantive garb, see *ante,* at 537–538, 546–547, make little sense. The majority suggests that even if the statute must be read to require a comparison, the one it compels dooms the trustee always to come up short. A property's "value," the Court would have us believe, should be determined with reference to a State's rules governing creditors' enforcement of their rights, in the same fashion that it might encom-

The "neologism," *ante,* at 537, "reasonably equivalent value" (read in light of the amendments confirming that foreclosures are to be judged under the same standard as are

---

pass a zoning rule governing (as a matter of state law) a neighboring landowner's entitlement to build a gas station. But the analogy proposed ignores the patent difference between these two aspects of the "regulatory background," *ante,* at 539: while the zoning ordinance would reduce the value of the property "to the world," foreclosure rules affect not the price any purchaser "would pay," *ibid.,* but rather the means by which the mortgagee is permitted to extract its entitlement from the entire "value" of the property.

Such distinctions are a mainstay of bankruptcy law, where it is commonly said that creditors' "substantive" state-law rights "survive" in bankruptcy, while their "procedural" or "remedial" rights under state debtor-creditor law give way, see, *e. g., United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 370–371 (1988) (refusing to treat "right to immediate foreclosure" as an "interest in property" under applicable nonbankruptcy law); *Owen* v. *Owen,* 500 U. S. 305 (1991) (bankruptcy exemption does not incorporate state law with respect to liens); *United States* v. *Whiting Pools, Inc.,* 462 U. S. 198, 206–207 (1983); see also *Gelfert* v. *National City Bank of N. Y.,* 313 U. S., at 234 ("[T]he advantages of a forced sale" are not "a . . . property right" under the Constitution). And while state foreclosure rules reflect, *inter alia,* an understandable judgment that creditors should not be forced to wait indefinitely as their defaulting debtors waste the value of loan collateral, bankruptcy law affords mortgagees distinct and presumably adequate protections for their interest, see 11 U. S. C. §§ 548(c), 550(d)(1), 362(d); *Wright* v. *Union Central Life Ins. Co.,* 311 U. S. 273, 278–279 (1940), along with the general promise that the debtor's estate will, effectively, be maximized in the interest of creditors.

The majority professes to be "baffled," *ante,* at 539, n. 5, by this commonsense distinction between state zoning laws and state foreclosure procedures. But a zoning rule is not merely "price-affecting," *ante,* at 539: it affects the property's value (*i. e.,* the price for which any transferee can expect to resell). State-mandated foreclosure procedures, by contrast, might be called "price-affecting," in the sense that adherence solely to their minimal requirements will no doubt keep sale prices low. But state rules hardly forbid mortgagees to make efforts to encourage more robust bidding at foreclosure sales; they simply fail to furnish sellers any reason to do so, see *infra.*

other transfers) has a single meaning in the one provision in which it figures: a court should discern the "value" of the property transferred and determine whether the price paid was, under the circumstances, "less than reasonabl[e]." There is thus no reason to rebuke the Courts of Appeals for having failed to "come to grips," *ante*, at 538, with the implications of the fact that foreclosure sales cannot be expected to yield fair market value. The statute has done so for them. As courts considering nonforeclosure transfers often acknowledge, the qualification "reasonably equivalent" itself embodies both an awareness that the assets of insolvent debtors are commonly transferred under conditions that will yield less than their optimal value and a judgment that avoidance in bankruptcy (unsettling as it does the expectations of parties who may have dealt with the debtor in good faith) should only occur when it is clear that the bankruptcy estate will be substantially augmented. See, *e. g., In re Southmark Corp.,* 138 B. R. 820, 829–830 (Bkrtcy. Ct. ND Tex. 1992) (court must compare "the value of what went out with the value of what came in," but the equivalence need not be "dollar for dollar") (citation omitted); *In re Countdown of Conn., Inc.,* 115 B. R. 18, 21 (Bkrtcy. Ct. Conn. 1990) ("[S]ome disparity between the value of the collateral and the value of debt does not necessarily lead to a finding of lack of reasonably equivalent value").[11]

---

[11] Indeed, it is not clear from its opinion that the Court has "come to grips," *ante,* at 538, with the reality that "involuntary" transfers occur outside the real property setting, that legally voluntary transfers can be involuntary in fact, and that, where insolvent debtors on the threshold of bankruptcy are concerned, transfers for full, "fair market" price are more likely the exception than the rule. On the Court's reading, for example, nothing would prevent a debtor who deeded property to a mortgagee "in lieu of foreclosure" prior to bankruptcy from having the transaction set aside, under the "ordinar[y]," *ante,* at 545, substantive standard.

## B

I do not share in my colleagues' apparently extreme discomfort at the prospect of vesting bankruptcy courts with responsibility for determining whether "reasonably equivalent value" was received in cases like this one, nor is the suggestion well taken that doing so is an improper abdication. Those courts regularly make comparably difficult (and contestable) determinations about the "reasonably equivalent value" of assets transferred through other means than foreclosure sales, see, e. g., Covey v. Commercial Nat. Bank, 960 F. 2d 657, 661–662 (CA7 1992) (rejecting creditor's claim that resale price may be presumed to be "reasonably equivalent value" when that creditor "seiz[es] an asset and sell[s] it for just enough to cover its loan (even if it would have been worth substantially more as part of an ongoing enterprise)"); In re Morris Communications NC, Inc., 914 F. 2d 458 (CA4 1990) (for "reasonably equivalent value" purposes, worth of entry in cellular phone license "lottery" should be discounted to reflect probability of winning); cf. In re Royal Coach Country, Inc., 125 B. R. 668, 673–674 (Bkrtcy. Ct. MD Fla. 1991) (avoiding exchange of 1984 truck valued at $2,800 for 1981 car valued at $500), and there is every reason to believe that they, familiar with these cases (and with local conditions) as we are not, will give the term sensible content in evaluating particular transfers on foreclosure, cf. United States v. Energy Resources Co., 495 U. S. 545, 549 (1990); NLRB v. Bildisco & Bildisco, 465 U. S. 513, 527 (1984); Rosen v. Barclays Bank of N. Y., 115 B. R. 433 (EDNY 1990).[12] As in other § 548(a)(2) cases, a trustee seeking

---

[12] It is only by renewing, see ante, at 548, its extreme claim, but see n. 2, supra, that market value is wholly irrelevant to the analysis of foreclosure-sale transfer (and that bankruptcy courts are debarred from even "referring" to it) that the Court is able to support its assertion that evaluations of such transactions are somehow uniquely beyond their ken.

The majority, as part of its last-ditch effort to salvage some vitality for the provision, itself would require bankruptcy judges to speculate as to the

avoidance of a foreclosure-sale transfer must persuade the bankruptcy court that the price obtained on prebankruptcy transfer was "unreasonabl[y]" low, and as in other cases under the provision, the gravamen of such a claim will be that the challenged transfer significantly and needlessly diminished the bankruptcy estate, *i. e.*, that it extinguished a substantial equity interest of the debtor and that the foreclosing mortgagee failed to take measures which (consistently with state law, if not required by it) would have augmented the price realized.[13]

---

price "that would have been received if the foreclosure sale had proceeded according to [state] law." *Ante*, at 546; cf. *ante*, at 540 (expressing skepticism about judicial competence to determine "such a thing" as a "fair" forced-sale price).

[13] In this regard and in its professions of deference to the processes of local self-government, the Court wrongly elides any distinction between what state law commands and what the States permit. While foreclosure sales "under state law" may typically be sparsely attended and yield low prices, see *infra*, at 564, these are perhaps less the result of state law "strictures," *ante*, at 538, than of what state law fails to supply, incentives for foreclosing lenders to seek higher prices (by availing themselves of advertising or brokerage services, for example). Thus, in judging the reasonableness of an apparently low price, it will surely make sense to take into account (as the Court holds a bankruptcy court is forbidden to) whether a mortgagee who promptly resold the property at a large profit answers, "I did the most that could be expected of me" or "I did the least I was allowed to."

I also do not join my colleagues in their special scorn for the "70% rule" associated with *Durrett* v. *Washington Nat. Ins. Co.*, 621 F. 2d 201 (CA5 1980), which they decry, *ante*, at 540, as less an exercise in statutory interpretation than one of "policy determinatio[n]." Such, of course, it may be, in the limited sense that the statute's text no more mentions the 70% figure than it singles out procedurally regular foreclosure sales for the special treatment the Court accords them. But the *Durrett* "rule," as its expositor has long made clear, claims only to be a description of what foreclosure prices have, in practice, been found "reasonabl[e]," and as such, it is consistent (as the majority's "policy determination" is not), with the textual directive that one value be compared to another, the transfer being set aside when one is unreasonably "less than" the other. To the extent, moreover, that *Durrett* is said to have announced a "rule," it is better

Whether that enquiry is described as a search for a benchmark "'fair' forced-sale price," *ante*, at 540, or for the price that was reasonable under the circumstances, cf. *ante*, at 538, n. 4, is ultimately, as the Court itself seems to acknowledge, see *ante*, at 540, of no greater moment than whether the rule the Court discerns in the provision is styled an "exception," an "irrebuttable presumption," or a rule of *per se* validity. The majority seems to invoke these largely synonymous terms in service of its thesis that the provision's text is "ambiguous" (and therefore ripe for application of policy-based construction rules), but the question presented here, whether the term "less than reasonably equivalent value" may be read to forestall all enquiry beyond whether state-law foreclosure procedures were adhered to, admits only two answers, and only one of these, in the negative, is within the "apparent authority," *ibid.*, conferred on courts by the text of the Bankruptcy Code.[14]

## C

What plain meaning requires and courts can provide, indeed, the policies underlying a national bankruptcy law fully

understood as recognizing a "safe harbor" or affirmative defense for bidding mortgagees or other transferees who paid 70% or more of a property's appraised value at the time of sale.

[14] The Court's criticism, *ante*, at 546–548, deftly conflates two distinct questions: is the price on procedurally correct and noncollusive sale presumed irrebuttably to be reasonably equivalent value (the question before us) and, if not, what are the criteria (a question not raised here but explored by courts that have rejected the irrebuttable presumption)? What is "plain" is the answer to the first question, thanks to the plain language, whose meaning is confirmed by policy and statutory history. The answer to the second may not be plain in the sense that the criteria might be self-evident, see n. 13, *supra*, but want of self-evidence hardly justifies retreat from the obvious answer to the first question. Courts routinely derive criteria, unexpressed in a statute, to implement standards that are statutorily expressed, and in a proper case this Court could (but for the majority's decision) weigh the relative merits of the subtly different approaches taken by courts that have rejected the irrebuttable presumption.

support. This case is a far cry from the rare one where the effect of implementing the ordinary meaning of the statutory text would be "patent absurdity," see *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 452 (1987) (SCALIA, J., concurring in judgment), or "demonstrably at odds with the intentions of its drafters," *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 244 (1989) (internal quotation marks omitted).[15] Permitting avoidance of procedurally regular foreclosure sales for low prices (and thereby returning a valuable asset to the bankruptcy estate) is plainly consistent with those policies of obtaining a maximum and equitable distribution for creditors and ensuring a "fresh start" for individual debtors, which the Court has often said are at the core of federal bankruptcy law. See *Stellwagen* v. *Clum*, 245 U. S. 605, 617 (1918); *Williams* v. *United States Fidelity & Guaranty Co.*, 236 U. S. 549, 554–555 (1915). They are not, of course, any less the policies of federal bankruptcy law simply because state courts will not, for a mortgagor's benefit, set aside a foreclosure sale for "price inadequacy" alone.[16] The unwill-

---

[15] Tellingly, while the Court's opinion celebrates fraudulent conveyance law and state foreclosure law as the "twin pillars" of creditor-debtor regulation, it evinces no special appreciation of the fact that this case arises under the Bankruptcy Code, which, in maintaining the national system of credit and commerce, embodies policies distinct from those of state debtor-creditor law, see generally *Stellwagen* v. *Clum*, 245 U. S. 605, 617 (1918), and which accordingly endows trustees with avoidance power beyond what state law provides, see *Board of Trade of Chicago* v. *Johnson*, 264 U. S. 1, 10 (1924); *Stellwagen, supra*, at 617; 11 U. S. C. §§ 541(a), 544(a).

[16] Although the majority accurately states this " 'black letter' " law, it also acknowledges that courts will avoid a foreclosure sale for a price that "shock[s] the conscience," see *ante*, at 542 (internal quotation marks omitted), a standard that has been invoked to justify setting aside sales yielding as much as 87% of appraised value. See generally Washburn, The Judicial and Legislative Response to Price Inadequacy in Mortgage Foreclosure Sales, 53 S. Cal. L. Rev. 843, 862–870 (1980). Moreover, while price inadequacy "alone" may not be enough to set aside a sale, such inadequacy will often induce a court to undertake a sort of "strict scrutiny" of a sale's compliance with state procedures. See, *e. g., id.*, at 861.

ingness of the state courts to upset a foreclosure sale for that reason does not address the question of what "reasonably equivalent value" means in bankruptcy law, any more than the refusal of those same courts to set aside a contract for "mere inadequacy of consideration," see Restatement (Second) of Contracts § 79 (1981), would define the scope of the trustee's power to reject executory contracts. See 11 U. S. C. § 365 (1988 ed. and Supp. IV). On the contrary, a central premise of the bankruptcy avoidance powers is that what state law plainly allows as acceptable or "fair," as between a debtor and a particular creditor, may be set aside because of its impact on other creditors or on the debtor's chances for a fresh start.

When the prospect of such avoidance is absent, indeed, the economic interests of a foreclosing mortgagee often stand in stark opposition to those of the debtor himself and of his other creditors. At a typical foreclosure sale, a mortgagee has no incentive to bid any more than the amount of the indebtedness, since any "surplus" would be turned over to the debtor (or junior lienholder), and, in some States, it can even be advantageous for the creditor to bid less and seek a deficiency judgment. See generally Washburn, The Judicial and Legislative Response to Price Inadequacy in Mortgage Foreclosure Sales, 53 S. Cal. L. Rev. 843, 847–851 (1980); Ehrlich, Avoidance of Foreclosure Sales as Fraudulent Conveyances: Accommodating State and Federal Objectives, 71 Va. L. Rev. 933, 959–962 (1985); G. Osborne, G. Nelson, & D. Whitman, Real Estate Finance Law § 8.3, p. 528 (1979). And where a property is obviously worth more than the amount of the indebtedness, the lending mortgagee's interests are served best if the foreclosure sale is poorly attended; then, the lender is more likely to take the property by bidding the amount of indebtedness, retaining for itself any profits from resale. While state foreclosure procedures may somewhat mitigate the potential for this sort of opportunism (by requiring for publication of notice, for example), it surely

is plausible that Congress, in drafting the Bankruptcy Code, would find it intolerable that a debtor's assets be wasted and the bankruptcy estate diminished, solely to speed a mortgagee's recovery.

## II

Confronted with the eminent sense of the natural reading, the Court seeks finally to place this case in a line of decisions, e. g., Gregory v. Ashcroft, 501 U. S. 452 (1991), in which we have held that something more than mere plain language is required.[17] Because the stability of title in real property may be said to be an "important" state interest, the Court suggests, see ante, at 544, the statute must be presumed to contain an implicit foreclosure-sale exception, which Congress must override expressly or not at all. Our cases impose no such burden on Congress, however. To be sure, they do offer support for the proposition that when the Bankruptcy Code is truly silent or ambiguous, it should not be

---

[17] The Court dangles the possibility that Gregory itself is somehow pertinent to this case, but that cannot be so. There, invoking principles of constitutional avoidance, we recognized a "plain statement" rule, whereby Congress could supplant state powers "reserved under the Tenth Amendment" and "at the heart of representative government," only by making its intent to do so unmistakably clear. Unlike the States' authority to "determine the qualifications of their most important government officials," 501 U. S., at 463 (e. g., to enforce a retirement age for state judges mandated by the State Constitution, at issue in Gregory), the authority of the States in defining and adjusting the relations between debtors and creditors has never been plenary, nor could it fairly be called "essential to their independence." In making the improbable contrary assertion, the Court converts a stray phrase in American Land Co. v. Zeiss, 219 U. S. 47 (1911), which upheld against substantive due process challenge the power of a State to legislate with respect to land titles (California's effort to restore order after title records had been destroyed in the calamitous 1906 San Francisco earthquake) into a pronouncement about the allocation of responsibility between the National Government and the States. Cf. Cipollone v. Liggett Group, Inc., 505 U. S. 504, 546 (1992) (SCALIA, J., concurring in judgment in part and dissenting in part) (emphasizing the inapplicability of "clear-statement" rules to ordinary pre-emption cases).

read as departing from previous practice, see, *e. g., Dewsnup* v. *Timm,* 502 U. S. 410 (1992); *Butner* v. *United States,* 440 U. S. 48, 54 (1979). But we have never required Congress to supply "clearer textual guidance" when the apparent meaning of the Bankruptcy Code's text is itself clear, as it is here. See *Ron Pair,* 489 U. S., at 240 ("[I]t is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute"); cf. *Dewsnup, supra,* at 434 (SCALIA, J., dissenting) (Court should not "venerat[e] 'pre-Code law'" at the expense of plain statutory meaning).[18]

We have, on many prior occasions, refused to depart from plain Code meaning in spite of arguments that doing that would vindicate similar, and presumably equally "important," state interests. In *Owen* v. *Owen,* 500 U. S. 305 (1991), for example, the Court refused to hold that the state "opt-out" policy embodied in § 522(b)(1) required immunity from avoidance under § 522(f) for a lien binding under Florida's exemption rules. We emphasized that "[n]othing in the text of § 522(f) remotely justifies treating the [state and federal] exemptions differently." 500 U. S., at 313. And in *Johnson* v. *Home State Bank,* 501 U. S. 78 (1991), we relied on plain Code language to allow a debtor who had "stripped" himself of personal mortgage liability under Chapter 7 to reschedule the remaining indebtedness under Chapter 13, notwithstanding a plausible contrary argument based on Code structure and a complete dearth of precedent for the manoeuver under state law and prior bankruptcy practice.

---

[18] Even if plain language is insufficiently "clear guidance" for the Court, further guidance is at hand here. The provision at hand was amended in the face of judicial decisions driven by the same policy concerns that animate the Court, to make plain that foreclosure sales and other "involuntary" transfers are within the sweep of the avoidance power.

The Court has indeed given full effect to Bankruptcy Code terms even in cases where the Code would appear to have cut closer to the heart of state power than it does here. No "clearer textual guidance" than a general definitional provision was required, for example, to hold that criminal restitution could be a "debt" dischargeable under Chapter 13, see *Davenport*, 495 U. S., at 563–564 (declining to "carve out a broad judicial exception" from statutory term, even to avoid "hamper[ing] the flexibility of state criminal judges"). Nor, in *Perez* v. *Campbell*, 402 U. S. 637 (1971), did we require an express reference to state highway safety laws before construing the generally worded discharge provision of the Bankruptcy Act to bar application of a state statute suspending the driver's licenses of uninsured tortfeasors.[19]

Rather than allow state practice to trump the plain meaning of federal statutes, cf. *Adams Fruit Co.* v. *Barrett*, 494 U. S. 638, 648 (1990), our cases describe a contrary rule: whether or not Congress has used any special "pre-emptive" language, state regulation must yield to the extent it actually conflicts with federal law. This is no less true of laws enacted under Congress's power to "establish . . . uniform Laws on the subject of Bankruptcies," U. S. Const., Art. I, § 8, cl. 4, than of those passed under its Commerce Clause power. See generally *Perez* v. *Campbell, supra;* cf. *id.,* at

---

[19] Only over vigorous dissent did the Court read the trustee's generally worded abandonment power, 11 U. S. C. § 554, as not authorizing abandonment "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." *Midlantic Nat. Bank* v. *New Jersey Dept. of Environmental Protection,* 474 U. S. 494, 505 (1986); cf. *id.,* at 513 (REHNQUIST, J., dissenting) ("Congress knew how to draft an exception covering the exercise of 'certain' police powers when it wanted to"); cf. also L. Cherkis & L. King, Collier Real Estate Transactions and the Bankruptcy Code, p. 6–24 (1992) (post-*Midlantic* cases suggest that "if the hazardous substances on the property do not pose immediate danger to the public, and if the trustee has promptly notified local environmental authorities of the contamination and cooperated with them, abandonment may be permitted").

651–652 (rejecting the "aberrational doctrine . . . that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration"); *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 545, 546 (1992) (SCALIA, J., concurring in judgment in part and dissenting in part) (arguing against a "presumption against . . . pre-emption" of "historic police powers") (internal quotation marks omitted).

Nor, finally, is it appropriate for the Court to look to "field pre-emption" cases, see *ante*, at 544, to support the higher duty of clarity it seeks to impose on Congress. As written and as applied by the majority of Courts of Appeals to construe it, the disputed Code provision comes nowhere near working the fundamental displacement of the state law of foreclosure procedure that the majority's rhetoric conjures.[20]

---

[20] Talk of " 'radica[l] adjust[ments to] the balance of state and national authority,' " *ante*, at 544, notwithstanding, the Court's submission with respect to "displacement" consists solely of the fact that some private companies in *Durrett* jurisdictions have required purchasers of title insurance to accept policies with "specially crafted exceptions from coverage in many policies issued for properties purchased at foreclosure sales." *Ante*, at 544 (citing Cherkis & King, *supra*, at 5–18 to 5–19). The source cited by the Court reports that these exceptions have been demanded when mortgagees are the purchasers, but have not been required in policies issued to third-party purchasers or their transferees, Cherkis & King, *supra*, at 5–18 to 5–19, and that such clauses have neither been limited to *Durrett* jurisdictions, nor confined to avoidance under federal bankruptcy law. See Cherkis & King, *supra*, at 5–10 (noting one standard exclusion from coverage for "[a]ny claim, which arises . . . by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws"). Nothing in the Bankruptcy Code, moreover, deprives the States of their broad powers to regulate directly the terms and conditions of title insurance policies.

The "federally created cloud" on title seems hardly to be the Damoclean specter that the Court makes it out to be. In the nearly 14 years since the *Durrett* decision, the bankruptcy reports have included a relative handful of decisions actually setting aside foreclosure sales, nor do the States, either inside or outside *Durrett* jurisdictions, seem to have ven-

To the contrary, construing §548(a)(2)(A) as authorizing avoidance of an insolvent's recent foreclosure-sale transfer in which "less than a reasonably equivalent value" was obtained is no more pre-emptive of state foreclosure procedures than the trustee's power to set aside transfers by marital dissolution decree, see *Britt* v. *Damson*, 334 F. 2d 896 (CA9 1964), cert. denied, 379 U. S. 966 (1965); *In re Lange*, 35 B. R. 579 (Bkrtcy. Ct. ED Mo. 1983), "pre-empts" state domestic relations law,[21] or the power to reject executory contracts, see 11 U. S. C. §365, "displaces" the state law of voluntary obligation. While it is surely true that if the provision were accorded its plain meaning, some States (and many mortgagees) would take steps to diminish the risk that particular transactions would be set aside, such voluntary action should not be cause for dismay: it would advance core Bankruptcy Code purposes of augmenting the bankruptcy estate and improving the debtor's prospects for a "fresh start," without compromising lenders' state-law rights to move expeditiously against the property for the money owed. To the extent, in any event, that the respondents and their numerous *amici* are correct that the "important" policy favoring security of title should count more and the "important" bankruptcy policies should count less, Congress, and not this Court, is the appropriate body to provide a foreclosure-sale exception. See *Wolas*, 502 U. S., at 162. See also S. 1358, 100th Cong., 1st Sess. (1987) (proposed amendment creating foreclosure-sale exception).

## III

Like the Court, I understand this case to involve a choice between two possible statutory provisions: one authorizing

---

tured major changes in the "diverse networks of . . . rules governing the foreclosure process." See *ante*, at 541.

[21] But cf. *Wetmore* v. *Markoe*, 196 U. S. 68 (1904) (alimony is not a "debt" subject to discharge under the Bankruptcy Act).

the trustee to avoid "involuntar[y] . . . transfers [including foreclosure sales] . . . [for] less than a reasonably equivalent value," see 11 U. S. C. § 548(a), and another precluding such avoidance when "[a] secured party or third party purchaser . . . obtains title to an interest of the debtor in property pursuant to a good faith prepetition foreclosure . . . proceeding . . . permitting . . . the realization of security upon default of the borrower," see S. 445, 98th Cong., 1st Sess., § 360 (1983). But that choice is not ours to make, for Congress made it in 1984, by enacting the former alternative into law and not the latter. Without some indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it. Doing that in this case would produce no frustration or absurdity, but quite the opposite.