[615 NYS2d 886]

WATERWAYS LIMITED, Respondent, v BARCLAYS BANK PLC, Appellant.

First Department, August 25, 1994

## APPEARANCES OF COUNSEL

*John J. Kerr, Jr.,* of counsel *(Eric L. Kriftcher* and *Elizabeth A. Fuerstman* with him on the brief; *Simpson Thacher & Bartlett,* attorneys), for appellant.

*Joseph L. Hutner* of counsel *(Robert E. DeRight, Jr.,* and *Robert D. Goldstein* with him on the brief; *Epstein Becker & Green, P. C.,* attorneys), for respondent.

## OPINION OF THE COURT

KUPFERMAN, J.

This action arises out of plaintiff's default on a $9 million loan from Barclays Bank PLC for the renovation of the Grotto Bay Beach Hotel and Tennis Club in Bermuda, which it owned, and the subsequent appointment of a receiver and sale of the mortgaged property for $16.5 million. The verified complaint asserts that Barclays wrongfully declared the loan in default and appointed a receiver, and that the sale price was too low. Plaintiff claims that the land and hotel were worth $23 million, and seeks $7,265,000 in damages, $265,000 representing the costs and fees for the receiver.

This matter was previously before us, when we reversed the IAS Court's dismissal on forum non conveniens grounds (174 AD2d 324). A year later, Barclays moved pursuant to CPLR 3212 for summary judgment dismissing the verified complaint.

In support of its motion, Barclays submitted excerpts from the deposition testimony of the various persons involved in the transactions at issue, along with numerous documents, including copies of the loan documents, consisting of a Building Loan Agreement, a Note, a Mortgage and a Debenture, all dated February 16, 1988. Paragraph 25 of the Building Loan Agreement contains the following provision regarding modifications: "25. *Modification.* This Agreement may not be modified, amended or terminated, except by an agreement in writing executed by the parties hereto." The accompanying Note is a 10-year note, which was to mature on February 16, 1998. Pursuant to the terms of the Note, plaintiff was to make interest payments commencing August 1, 1988 and on the first day of each calendar quarter thereafter until maturity. In addition, according to the amortization schedule annexed and made part of the Note, plaintiff was required to make periodic

payments of principal. The first principal payment in the amount of $100,000 was due October 1, 1988.

The Note contains the following default provisions:

"11. It is hereby expressly agreed that the entire unpaid Principal Balance, together with all interest accrued and unpaid thereon and all other sums due under this Note and the Mortgage (hereinafter collectively referred to as the Debt), shall without notice become immediately due and payable at the option of Payee on the happening of any default or event by which, under the terms of the Mortgage, the Building Loan Agreement or the Other Security Documents, the Debt may or shall become due and payable * * *

"14.

Maker hereby waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note and agrees to pay all costs of collection when incurred, including reasonable attorneys' fees * * * *No release of any security for the principal sum due under this Note or extension of time for payment of this Note, or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Mortgage, the Building Loan Agreement or the Other Security Documents * * * shall release, discharge, modify, change or affect the liability of Maker under this Note, the Mortgage, the Building Loan Agreement or the Other Security Documents. * * **

"19. This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of such change or termination is sought." (Emphasis added.)

In his affidavit in support of Barclays' motion, Robert M. Dowling, the vice-president of Barclays' Real Estate Group, asserts that in or around June 1988, plaintiff's expansion and renovation of the hotel resulted in a cost overrun for which plaintiff needed additional cash. After plaintiff submitted additional financial information, and based upon a projected income of $1.6 million for 1988, the parties executed a modification to the loan agreement for an additional $1 million. The writings connected with this modification consisted of a second promissory note for the sum of one million United States dollars (the Second Note), a "First Further Charge", which expanded Barclays' interest in the mortgaged property to include the additional $1 million, a "Further Debenture" and a "First Agreement of Modification of Building Loan Agreement", all dated and executed August 26, 1988.

It is undisputed, that plaintiff defaulted and failed to make the principal payment due October 1, 1988 under the original Note. Dowling states that after plaintiff's default, he entered into negotiations with plaintiff's managing director George Robinson and its president Gary Dischel in an attempt to restructure the loan and that, at a first meeting with Robinson, which took place on November 9, 1988 in New York, Robinson requested additional time to repay the loan and informed Barclays that plaintiff would be unable to make any payments of principal or interest before July 1989. Dowling states that he found this information to be "extremely troubling" and requested a meeting with Waterways' president, Gary Dischel.

Dowling met with Dischel and Robinson in Boston on December 6, 1988 at the office of plaintiff's attorneys. Dischel confirmed that plaintiff was unable to repay any principal or interest but, according to Dowling, Dischel assured him that plaintiff was current with its other creditors, specifically its trade creditors in Bermuda. Dowling further states that during the course of the meeting Dischel indicated that he wanted to sell the hotel and use the proceeds to pay off the loan, and that they discussed how the loan might be restructured to accomplish that goal. Dowling asserts that the day after the meeting with Dischel he recorded the terms discussed at the meeting in a memorandum drafted to David Rockwell at Barclays' Credit Advances Department, North America, the department that had approved the initial $9 million loan to plaintiff. The December 7, 1988 memo to Rockwell states:

"TO: David Rockwell, Vice President, CADNA

"FROM: Robert Dowling, Vice President, REG * * *

"The above mortgage facility is technically in default as they failed to provide us with a $100,000 principal payment in October. We have been in daily contact with them concerning this payment and our concern over the financial health of the loan in general. We met with the principals of the hotel in Boston yesterday to discuss the status of our loan and reached the following conclusions:

"A) Borrower will prepay up to $500,000 in interest on the loan;

"B) Loan Maturity will be shortened to June of 1989 from Feb of 1990;

"C) Borrower will put the hotel up for sale immediately:

"D) Barclays will warrant the amortization schedule; and

"E) Bermuda Commercial Bank will provide credit support by keeping their line of credit in place.

"The above was necessitated by the hotel's inability to generate the funds from operations to support the level of debt as occupancy for 1988 was only fifty-one percent (51%), which was approximately eleven [percent] (11%) less than budgeted. We remain confident that the hotel will command a price far in excess of the present debt, and with the prepayment of interest we do not anticipate any further problems, and in any case, we will keep you advised."

Dowling asserts that because the proposed restructuring was dependent upon Bermuda Commercial maintaining a line of credit, he instructed his secretary to fax a copy to Trevor Allwood, an officer at Bermuda Commercial which had a 22.2% participation in Barclays' original $9 million loan, and which had extended a $500,000 line of credit to plaintiff, independent of the credit extended for working capital. He further asserts, however, that his secretary mistakenly telecopied the memo not to Allwood but to Robinson, and that when he found out and asked Robinson to return it, Robinson refused.

Dowling contends that negotiations continued and a meeting was held in New York on December 12, 1988 at which plaintiff sought to reduce the initially proposed $500,000 interest payment, and during which Dischel described efforts to sell the Hotel. It appears that plaintiff then went about the business of trying to raise the $500,000 and, in further support of the motion for summary judgment, Dowling annexes a letter from Robinson dated December 14, 1988, which he asserts demonstrates that the parties were still in the negotiation phase and that no additional amendment had been made. The letter states, in pertinent part:

"I believe that all the conditions set by Barclays have now been satisfied. Barry [L. Shailer, senior vice-president of Bank of Bermuda] will confirm to you, either today or tomorrow, *that $500,000 is available to be transferred to Barclays once the mortgage documents have been amended and signed by both parties.* Also that the operating overdraft facility, to be provided by Bermuda Commercial Bank, that we agreed at our meeting with you and Valerie in Boston, in the amount of $750,000 is in place * * *

"I appreciate your extention *[sic]* of time in concluding this agreement." (Emphasis added.)

It appears, however, that Bermuda Commercial was not willing to go along with this plan, inasmuch as, contrary to Dischel's representations to Dowling on December 6, 1988, plaintiff had approximately $2 million in unpaid bills, mostly to trade creditors, and, as a result, on December 20, 1988, Bermuda Commercial demanded repayment of all outstanding balances on plaintiff's line of credit. Predictably, Barclays followed suit and called in its loan on December 22 1988, demanding payment in full of the $10,000,000 principal balance plus accrued interest in the amount of $225,687.51.

After the loan was accelerated, and in light of plaintiff's unsuccessful attempts to sell the hotel (Dowling asserts that Dischel had informed him that he was seeking a price in the mid $20 million range), Barclays, on February 14, 1989, appointed Richard Kempe of Price Waterhouse as receiver. According to Dowling, he and Kempe determined that a private sale was preferable and more expedient than a public sale and would additionally protect the hotel's goodwill. Dowling asserts that he and Kempe understood that the down side of a private tender would leave them vulnerable to claims of an inadequate sale price and that, in order to avoid this risk, they attempted to secure the approval of all parties who might be affected by the sale before accepting any private offer.

On February 23, 1989, the receiver received an offer from a group of Bermudian investors led by Ralph Marshall and George Robinson. Marshall was formerly on plaintiff's board of directors and also owned Raphael Limited, one of plaintiff's three largest stockholders, while Robinson, as previously noted, was the managing director of the hotel. The receiver had rejected two prior offers from this group, even though they had been approved by plaintiff's directors and shareholders, one because it was conditioned upon "necessary government response," and the second because it was for $15.5 million in cash and an additional $1 million promissory note, conditioned upon government approval to build condominiums on the hotel property.

A special meeting of plaintiff's shareholders was held on March 2, 1989 with respect to the February 23rd offer. Out of the 1,031,955 shares issued and outstanding, 1,001,955 were voted in favor of the sale. One shareholder abstained from the vote, and no shares were voted against the sale.

Barclays also consented to the sale on or about March 3,

1989 and directed the receiver to sign the requisite papers. The sale to the Marshall group was consummated on March 16, 1989.

After the sale, the receiver transferred 10,000,000 United States dollars to Barclays in full payment of the loan, transferred payment in full on the line of credit to Bermuda Commercial, and paid another $2,377,774 to 347 of plaintiff's other secured creditors, consisting primarily of tradespeople, prior to being relieved in June 1989. In addition, the receiver's own fees of $265,000 were paid out of the proceeds.

Plaintiff opposed Barclays' motion for summary judgment and cross-moved for partial summary judgment dismissing Barclays' affirmative defenses and for sanctions. In his affidavit in opposition to Barclays' motion and in support of the cross motion, plaintiff's president Gary Dischel states that he and George Robinson attended the December 6, 1988 meeting in Boston and that during the meeting Dowling demanded the immediate payment of $500,000 upon threat of the appointment of a receiver in Bermuda. Dischel asserts that they reached an agreement to restructure the loan at the time and that plaintiff's agreement with Barclays was accurately reflected in the December 7, 1988 memorandum. Dischel further asserts that plaintiff performed this agreement by raising the $500,000 cash and immediately putting the hotel up for sale and that Barclays, therefore, wrongfully accelerated the loan obligation and appointed a receiver without notice. Dischel disputes that he had made representations to Dowling to the effect that plaintiff was current in its trade obligations and states that he had in fact informed Dowling of plaintiff's cash flow problems, which he claims were due to diminished hotel occupancy during 1988. Dischel asserts that Dowling never assured him that their agreement was conditioned upon the execution of formal written documents and that Dowling assured him that should serious negotiations for sale of the hotel be ongoing in June 1989, Barclays would not "pull the plug". Dischel also claims that the $500,000 was tendered to Barclays on December 14, 1988 by having such funds delivered to plaintiff's own account at Bermuda Commercial on December 20, 1988. The funds were obtained from a loan to a connected company, Waterways Knightsbridge Hotels, Ltd., which in turn loaned the money to plaintiff.

Dischel states that after Bermuda Commercial obtained information regarding an outstanding $133,000 obligation to the principal contractor on the hotel renovation, it demanded

immediate payment of the bill. Plaintiff again borrowed the money to pay the bill from its parent and/or sister company Knightsbridge. In addition, Knightsbridge injected an additional $633,000 of capital into plaintiff, which Dischel claims, would not have been done had he believed plaintiff had no "deal" with Barclays. Dischel goes on to describe his efforts to sell the hotel and various conversations he had with Dowling over the price. He also disputes Dowling's version of what transpired at the shareholder meeting and claims that Dowling was confused about plaintiff's true financial condition. Dischel further asserts that, in his presentation to the shareholders, the receiver made it appear as if plaintiff was faced with the "Hobson's choice" of either accepting the private offer or risking a public sale and that the receiver told the shareholders that a selling price at public auction probably would be $5 million less than it would under the terms of the Marshall group offer, especially after administrative and other costs associated with a public tender were taken into consideration. Dischel claims that he never intended to give up any claims against Barclays. Additional affidavits were submitted by Harry Hauser, a shareholder and director of Knightsbridge and a director and assistant secretary of plaintiff (affirming his belief that he agreed to the sale because of a belief that irreparable harm was done by the appointment of a receiver), and plaintiff's counsel (asserting that while not needed to defeat the motion, there was substantial discovery outstanding).

In a decision dated September 28, 1993, the IAS Court denied Barclays' motion and plaintiff's cross motion, stating, *inter alia,* that there were issues of fact created by the deposition testimony of key witnesses, which was sharply contradictory, which could not be decided on a motion for summary judgment. In addition, it found that the Dowling memorandum together with Barclays' equivocal conduct after sending notice of default sufficiently raised material issues of whether Barclays not only waived the requirement of written modification, but also rescinded the default notice when it continued negotiations with Waterways over the repayment of the loan. The court rejected Barclays' argument that, even if acceleration of the loan and appointment of the receiver were improper, ratification of the sale by plaintiff's shareholders constituted a waiver and estoppel, and accepted plaintiff's argument that shareholder approval was given to the receiver, not to Barclays, stating further that there was an issue of fact

with respect to whether the receiver was acting as the agent of the mortgagor or the mortgagee. It further found that the receiver's motive in submission of the Marshall group's offer to the Waterways' shareholders for approval was not as straightforward as Barclays claimed, stating that although the shareholders' approval may have conferred authority upon the receiver to complete the sale and pay the debts owed to Barclays and Bermuda Commercial, it did not follow that the approval operated as a waiver of plaintiff's claims against Barclays for the allegedly wrongful acceleration of the loan and appointment of the receiver.

We disagree with the IAS Court's conclusion and accordingly reverse and grant summary judgment dismissal.

The Debenture agreement executed by the parties in February 1988 clearly and unequivocally gave Barclays the right to appoint a receiver upon plaintiff's default under any of the loan documents, and there is no dispute that plaintiff defaulted in October 1988 by failing to make the first principal payment that became due under the Note. The fact that Barclays did not accelerate the loan at that time does not raise any issue of fact inasmuch as the Note, Mortgage and Building Loan Agreement clearly gave Barclays the option to forbear for a limited period of time and the discretion to determine whether or not to exercise its option to accelerate payment, and provided that any delay or forbearance did *not* constitute a waiver of any rights under the Note or other loan documents. Accordingly, Barclays' "ambiguous" behavior subsequent to plaintiff's default was entirely consistent with the documents and is insufficient to create an issue of fact.

Other "issues of fact" found by the IAS Court may also be eliminated by reference to the documents. First, there is no issue of fact with respect to whether the receiver was acting on behalf of the borrower or on behalf of the bank in this case inasmuch as condition 3 (2) of the Debenture clearly states that any receiver appointed upon default is the agent of the bank. Thus, the vote of the shareholders in ratifying the actions of the receiver, in effect, did ratify the actions of Barclays insofar as the sale price is concerned, and plaintiff's arguments in opposition to the finding of an estoppel, therefore, lack merit. Moreover, pursuant to the Debenture, any receiver appointed upon default had the right to "make any arrangements or compromises which he shall think expedient". Accordingly, to the extent that the complaint alleges that the sale price was inadequate, it should have been

dismissed. If Dischel or his associates believed that the sale price was inadequate at or prior to the shareholders' meeting, then they should have spoken up at that time. *(See, Giles Dyeing Mach. Co. v Klauder-Weldon Dyeing Mach. Co.,* 233 NY 470; *Lincoln Guild Hous. Corp. v Halper,* 161 AD2d 546, 547.)\*

The primary issue on appeal, therefore, is whether there was a modification of the loan agreement or an enforceable contract to forbear. In that regard, the parties have staked out two very different positions. Barclays asserts that the purported agreement to forbear constituted a modification of the loan agreement, insufficiently memorialized by a writing to be binding. Plaintiff, on the other hand, asserts that Barclays made a separate and binding agreement to forbear supported by independent consideration. As noted by Barclays, the assertion by plaintiff that there was an entirely separate and independent agreement is new, inasmuch as the complaint, which has not been amended, asserts merely a modification. Moreover, the only evidence of this purported agreement is the Dowling memorandum of December 7, 1988. Assuming, arguendo, that this document meets the requirements of the Statute of Frauds, it demonstrates, on its face, the existence of a condition precedent, i.e., the continuation of a line of credit by the Bermuda Commercial Bank, which undisputably was not met in this case. Accordingly, inasmuch as plaintiff cannot demonstrate the satisfaction of this condition precedent, its argument that a separate contract came into being has no merit.

Admittedly, the documents create an ambiguity with respect to whether or not the December 7, 1988 memorandum from Dowling to Rockwell, which in fact is initialed by Dowling, is sufficient to create an issue of fact as to whether there was a modification of the loan agreement. The ambiguity is created by juxtaposing paragraph 25 of the Building Loan Agreement which precludes modification "except by an agreement in writing executed by the parties", with paragraph 19

---

\* *(Cf., in general,* Klein, Outside Counsel, *The Demise of "Durrett",* NYLJ, June 13, 1994, at 1, col 1.) In *Durrett v Washington Natl. Ins. Co.* (621 F2d 201 [5th Cir 1980]) a foreclosure sale yielding less than 70% of fair market value was set aside as a fraudulent conveyance. It was effectively overruled by the United States Supreme Court in *BFP v Resolution Trust Corp.* (511 US —, 114 S Ct 1757, 128 L Ed 2d 556 [May 23, 1994]) in a 5 to 4 decision, holding that the noncollusive foreclosure sale cannot be so set aside on the ground the consideration received is inadequate.

of the Note which states, "This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of such change or termination is sought." While the Dowling memorandum clearly does not satisfy paragraph 25 of the Building Loan Agreement, it arguably is sufficient to satisfy the writing requirement under paragraph 19 of the Note. It also is arguable that the terms that the parties were seeking to modify were referable solely to the Note and not to the Building Loan Agreement. However, the practical application of these arguments to the facts of this case is troublesome for several reasons and while arguable, neither is sufficient to defeat Barclays' motion.

First, an internal office memorandum which is not even addressed to one of the purported parties to the alleged agreement, by its nature, carries no indicia of an offer and acceptance sufficient to satisfy the "agreement" language of paragraph 19. The cases cited by plaintiff *(see, e.g., Bakhshandeh v American Cyanamid Co.,* 8 AD2d 35, *affd* 8 NY2d 981), are somewhat supportive of this position but not entirely, inasmuch as they are geared toward the more restrictive language appearing under paragraph 25 of the Building Loan Agreement. Nevertheless, a second factor weighing against a finding of a binding modification in this case is the fact that the circumstances surrounding the August 1988 modification of the loan agreement demonstrate that the parties exercised formality in their prior course of dealing. There is also the December 14, 1988 letter from George Robinson, which plaintiff seeks to make light of, that contains an acknowledgement by plaintiff's representative that formalization of the purported agreement was contemplated. In addition, the condition precedent noted above also negates any finding that Barclays entered into a binding modification of the loan agreement. Note is also taken of paragraph (9) (b) of the Building Loan Agreement which provides, that as a condition precedent to Barclays' obligation to make further advances on the loan to plaintiff, plaintiff was required to demonstrate "payment of all bills and charges for which advances of the Loan have been previously made pursuant to the Agreement." Here, upon finding out that plaintiff had not paid its trade creditors, the Bermuda Commercial Bank foreclosed and Barclays followed suit. Moreover, the failure to meet such condition precedent within 30 days of the request for a further advance is also

defined as a default event pursuant to paragraph (12) (f) of the loan agreement

Thus, the documentary and other evidence submitted fails to establish that there was a binding modification of the Note or loan agreement. Rather, the documentary evidence, at best, demonstrates merely an agreement to agree to forbear or modify the loan agreement once certain conditions had been met. This is entirely consistent with the provisions of the other loan documents and the only "evidence" to the contrary are the self-serving statements of plaintiff's principals.

Accordingly, the order of the Supreme Court, New York County (Karla Moskowitz, J.), entered October 8, 1993, which denied the motion of defendant Barclays Bank PLC for summary judgment dismissing plaintiff's verified complaint, should be reversed to the extent appealed from, on the law, Barclays' motion should be granted and the verified complaint should be dismissed, without costs. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint, without costs.

SULLIVAN, J. P., WALLACH, ASCH and TOM, JJ., concur.

Order, Supreme Court, New York County, entered October 8, 1993, which denied the motion for defendant Barclays Bank PLC for summary judgment dismissing plaintiff's verified complaint, reversed to the extent appealed from, on the law, Barclays' motion granted and the verified complaint dismissed, without costs.