**In re Jill Ann CZEL, SSN 093–48–3462, Debtor.**

**James E. BURKE, Trustee, Plaintiff,**

**v.**

**R.J. McCANNA II, and Inez A. McCanna, Defendants.**

**Bankruptcy No. 7–91–13361 RA.**
**Adv. No. 93–1284 R.**

United States Bankruptcy Court, D. New Mexico.

Nov. 25, 1996.

Yvette J. Gonzales, Albuquerque, NM, for plaintiff.

Michael K. Daniels, Albuquerque, NM, for defendants.

### MEMORANDUM OPINION

STEWART ROSE, Bankruptcy Judge.

This is a lawsuit by the trustee to recover a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(2)(A). The parties stipulated that the debtor was insolvent on the date of

the transfer, that a transfer occurred, and that it occurred within one year before the date of the filing of the petition. The parties further stipulated that the fair market value of the property was $70,000. The only issue before the Court was whether the debtor received less than a reasonably equivalent value in exchange for the transfer under 11 U.S.C. § 548(a)(2). The trustee does not contend that this was a transfer with actual intent to hinder, delay or defraud creditors pursuant to 11 U.S.C. § 548(a)(1).

The Court tried the case on July 21, 1994, and found that the debtor received less than a reasonably equivalent value in exchange for the transfer and, because the defendants had sold the property transferred, entered judgment pursuant to 11 U.S.C. § 550 for the stipulated fair market value of the property transferred, less the secured balance due from the debtor to the transferees, as well as taxes paid by the transferees. The defendants appealed the decision to the United States District Court. The District Court adopted the Magistrate Judge's recommendation with one modification and the decision was reversed and the matter remanded to the Bankruptcy Court for findings consistent with the magistrate judge's proposed findings and recommended disposition. *See, R.J. McCanna II v. Burke,* 197 B.R. 333 (D.N.M. 1996). Thereafter, this court retried the matter, admitting into evidence the testimony of the prior trial. Additionally, the court considered evidence introduced by the Trustee regarding alleged collusive activities of the Defendant and third parties related to the transaction at issue. This evidence was heard over the objection of the defendant. The relevant facts adduced from the trial and the hearing on remand are outlined below.

Jill Czel is the debtor in the pending bankruptcy proceeding. She was married to Julian Czel. The property at issue in this case is community property. On December 31, 1986, the defendants, Mr. and Mrs. McCanna, sold to Julian E. Czel and Jill E. Czel a tract of land known as 16–A–2 which consisted of 13.422 acres near Placitas, New Mexico. The sale was made by a New Mexico standard form estate contract. The total purchase was $124,500 and the down payment

was $24,000. The balance of $100,500 was to be paid in monthly installments of $1106.59 or more with interest of 12% per annum, with the entire remaining balance due on December 31, 1991. The real estate contract provided for a late payment penalty of $250. The contract further provided that the property had not been platted and that it would be platted as soon as possible after closing.

Mr. McCanna testified that although Julian and Jill Czel were the purchasers of the property, that in fact the property was being purchased by the Czel family. The family consisted of Irene Czel, Julian Czel's mother, and Irene's husband who played no active part in the transaction, as well as Jim Czel, Julian Czel's brother. Mr. McCanna understood that Julian Czel, Jim Czel, and Irene Czel were each purchasing one-third of the property. He testified that he understood that Jim Czel did not wish to be a purchaser of record because a judgment of approximately $200,000 had been obtained against Jim Czel in Connecticut which was about to be domesticated in New Mexico. Mr. McCanna had no information as to why Irene Czel was not a purchaser of record. However, he testified that he only wished to sell the property, and did not care who the purchaser or purchasers were.

In 1987, a plat of the property was prepared dividing the property into three lots, which for convenience will be called Lots A, B, and C, and each of which contain 4.474 acres. The plat of this division of the property was recorded on March 11, 1991, in the office of the County Clerk of Sandoval County, New Mexico.

Former counsel for Julian Czel testified that after the property was purchased, Julian Czel and his brother, Jim Czel, had a falling out with respect to the conduct of their business, which lead to the filing of an involuntary bankruptcy of the corporate business and extensive litigation, conducted with great animosity. The attorney opined that Irene Czel, the mother of Julian and Jim Czel, probably sided with Jim Czel. In any event, the falling out precipitated serious financial consequences to Julian and Jill Czel.

Despite the family feud, the Czel family did agree on one thing: that they would split

the prior real estate contract with Mr. and Mrs. McCanna to provide that Julian and Jill Czel would purchase Lot A and that Irene Czel would purchase Lots B and C. On February 13, 1991, Mr. and Mrs. McCanna entered into a superseding real estate contract for Lot A with Julian and Jill Czel. On the same date they entered into a superseding real estate contract with Irene Czel for Lots B and C. The contract for Lot A with Julian and Jill Czel recited a total purchase price of $32,441.72, no down payment, and payments of $368.86 per month with 12% interest commencing March 31, 1991, and due the first day of the month thereafter until, December 31, 1991, when the entire balance was due.

The reality of the 1991 transaction was to split the purchase price, down payment and payments made on the original contract into thirds and to allocate one-third to the purchase of Lot A by Julian and Jill Czel. Thus, the purchase price of Lot A was $41,500 and the down payment was $8,000. The difference is $33,500 and the purchase price in the 1991 contract of $32,441.72 represents a reduction of the principal balance since 1986 of $1,058.28.

Although there is some dispute as to when Julian and Jill Czel failed to make the monthly payments called for in the 1991 contract, the documentary evidence indicates that they failed to make the payment due July 1, 1991, and that on July 17, 1991, in accordance with the provisions of the contract, a thirty-day demand letter was sent to them. When they failed to cure the default, the McCannas elected to forfeit the contract and recorded the special warranty deed placed in escrow with the contract on September 12, 1991.

Julian and Jill Czel had been sued by Professional Design Services, Inc., in a lawsuit commenced in 1990. A judgment was rendered against them on September 25, 1991, and a transcript of that judgment was recorded in the office of the County Clerk of Sandoval County on September 30, 1991.

At about the time Julian and Jill Czel failed to make the monthly installment on their contract to the McCannas, Julian had a telephone conversation with Mr. McCanna, in which he indicated that he was not going to be making any further payments on the contract. At the time Julian likely knew that the property would shortly be encumbered by a judgment lien, since Professional Design Services, Inc., was suing to collect for design services in connection with the property.

Mr. McCanna testified that shortly after he terminated the real estate contract on Lot A, Irene Czel approached him, and advised him that she had listed Lots B and C for sale and had obtained cash buyers. However, the title company closing the transaction had indicated that there was a problem with the title. What exactly that problem might be, Mr. McCanna did not know. However, Julian Czel's former attorney indicated that it might have been the execution of a mortgage of Julian Czel to himself on Lots A, B, and C prior to the 1991 modified real estate contracts. Mr. McCanna also indicated that perhaps the title problem was a judgment lien. In any event, Mrs. Czel proposed that Mr. and Mrs. McCanna terminate the real estate contracts with respect to Lots B and C, thereby disposing of the title problems, and then sell the lots to the cash buyers she had obtained.

Mr. and Mrs. McCanna did terminate the real estate contracts and sold Lots B and C to cash buyers for $70,000 each. Mr. and Mrs. McCanna entered into two agreements dated November 27, 1991, with Irene Czel. The first, plaintiff's exhibit 2, provided for the termination of the contract and recited that neither party had any claims against each other. The second agreement recites that the property is subject to purchase agreements which are assigned to the McCannas. The agreement provided the McCannas would comply with the purchase agreements and that the net proceeds from the sale of Lots B and C would be applied by the McCannas as part of the purchase price of Lot A, on which Irene Czel held an unexercised purchase option. The agreement only referred to the purchase option; the date of the purchase option is unknown and the option itself was not introduced into evidence. Irene Czel was to exercise the purchase option on Lot A within 10 days of the closing of Lots B and C. Irene Czel further agreed to indemnify and hold harmless the

McCannas from any loss, liability or expense incurred by the McCannas in the performance of the agreement.

Apparently the net proceeds from the sale of Lots B and C, after the deduction of the contract balances, in the previously terminated contract, were sufficient to pay the option price for Lot A. In fact, if we knew the option price, it is likely that it exceeded the fair market value of Lot A.

Mr. McCanna testified that he tendered a deed to Irene Czel for Lot A, but that she did not record it. He further testified that she then commenced a lawsuit against him. He stated that he did not know why Irene Czel had sued him. Ultimately, after the expenditure of some $10,000 in attorney's fees, the McCannas settled with Irene Czel by the conveyance of Lot A to her.

There are a great many facts which we will never know in this case. The sketchy description of many of the transactions leaves much to be desired. A number of the transactions may have been structured in derogation of the rights of creditors at various times. However, the only transaction sought to be set aside as a fraudulent conveyance is the forfeiture of the real estate contract by the McCannas with respect to Lot A being sold to Julian and Jill Czel.

■ On remand the issue has not changed. This Court must still determine whether the forfeiture of the real estate contract on Lot A was a fraudulent conveyance because, as the Trustee contends, reasonably equivalent value was not received. The magistrate judge's recommendation instructs this Court generally regarding the determination of reasonably equivalent value. To determine reasonably equivalent value it states that 1) fair market value may not be the sole determinant, 2) although not the sole factor, fair market value itself may be a factor that the court considers, 3) the property at issue must be disposed of in a manner consistent with the law of the forum state, and 4) all the facts of the case should be considered. *R.J. McCanna II v. Burke,* 197 B.R. 333, 339. This Court must consider "the value of the real property to the trustee at the time of the transfer had the trustee been holding the property subject to the terms of the dis-

tressed contract." *Id.* at 341. Finally, this Court is also instructed that the ability or inability of the Trustee to assume the real estate contract is a factor to consider in determining value. *Id.* at 336. With respect to the third consideration above, the magistrate judge also instructed with particularity that, following *BFP v. Resolution Trust Corporation,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), "the Bankruptcy Code must be 'construed to adopt rather than displace pre-existing state law.'" *Id.* at 337 (quoting, *BFP v. Resolution Trust Corporation,* 511 U.S. 531, ——, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994)). Because "this transfer involved the integral state interest of titles to real property" this Court must determine whether a state court would give redress under the circumstances.

■ *BFP supra,* established a broad test for determining reasonably equivalent value. *BFP* held that a regularly conducted, noncollusive foreclosure sale satisfies the requirement of reasonably equivalent value. *Id.* at ——, 114 S.Ct. at 1764. *BFP* does not specifically illuminate what is and is not reasonably equivalent value. One only knows that if all state procedures are complied with the sale will satisfy the requirements of reasonably equivalent value. *BFP* noted that the Bankruptcy Code provides no definition of "reasonably equivalent value" and only the word "value" is defined. *Id.* at ——, 114 S.Ct. at 1760. Similarly, the Uniform Fraudulent Transfer Act which also addresses fraudulent conveyances does not define reasonably equivalent value but comes to a determination similar with *BFP* because the Act provides "a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale. . . ." Unif. Fraudulent Transfer Act. § 3(b) (1984). Thus, it is fair to assume that the term, reasonably equivalent value, should have the same meaning in the Uniform Fraudulent Transfer Act as in the Bankruptcy Code. If reasonably equivalent value is used in the same manner in these two statutes of nationwide application, it is not for this Court to disagree. Therefore, the framework for deciding this issue is that

a regularly conducted, noncollusive foreclosure sale is a safe harbor from judicial invalidation as a fraudulent conveyance. This same safe harbor seems to apply to contract forfeitures. Thus, in *Butler v. Goldetsky,* 552 N.W.2d 226 (Minn.1996) the Minnesota Supreme Court considered, upon certification from the United States Bankruptcy Court, the issue of whether the Minnesota Fraudulent Transfer Act "app[lied]to regularly conducted, noncollusive statutory cancellations of contracts for deed ...." *Id.* at 226. The court held that a regularly conducted noncollusive cancellation of a contract for deed was reasonably equivalent value. *Id.* at 235. *See also, Vermillion v. Scarbrough, (In re Vermillion),* 176 B.R. 563 (Bankr.D.Or.1994) (*BFP* applies in real estate contract forfeiture). Although one may not define what reasonably equivalent value is in all contexts, a properly conducted forfeiture is not avoidable where the transfer comports with the requirements of state law. In this way, the integral interests of state law are respected and not "displaced" by the Bankruptcy Code. To this end this Court must consider whether the state law of forfeitures has been complied with.

■ This Court has done an extensive review of New Mexico state law regarding the forfeiture of real estate contracts. Unlike *Vermillion, supra,* this Court does not have the benefit of a statutory enactment but must discern the rules of law from fact specific case law precedent. This precedent recognizes that real estate contracts are valid in New Mexico, and "[a]bsent circumstances that result in an inequitable forfeiture, the courts will enforce a real estate contract." *R.J. McCanna II,* 197 B.R. 333, 337 (citing *Russell v. Richards,* 103 N.M. 48, 702 P.2d 993 (1985)). Despite the general recognition of validity of the real estate contract provisions, a real estate contract forfeiture will not be enforceable where such forfeiture would shock the judicial conscience. *Id.* at 338. A regularly conducted noncollusive foreclosure falls within the safe harbor. A regularly conducted noncollusive forfeiture should similarly fall within the safe harbor.

This Court must determine whether the contract forfeiture on Lot A shocked the conscience of the Court. The Trustee urges that the facts of *Huckins v. Ritter,* 99 N.M. 560, 661 P.2d 52 (1983) are analogous to this case. *Huckins v. Ritter* involved a purchase of residential real property in Ruidoso. *Id.* at 561, 661 P.2d at 53. The purchase price was $155,000, and the down payment was $45,000. *Id.* The purchasers assumed an underlying mortgage, and had a balloon payment for the outstanding balance, $69,274.67 due within three months of the down payment. *Id.* The purchasers made the down payment but were unable to make the balloon payment. *Id.* The seller forfeited the contract and retained the down payment. *Id.* The New Mexico Supreme Court held that this forfeiture shocked the conscience of the court because retention of the down payment was unfair under the circumstances. *Id.* at 562, 661 P.2d at 54. The Court held that the purchasers were entitled to return of the down payment, less reasonable rental for the period of their occupancy, any diminution in value of the property during purchasers' occupancy and a reasonable attorneys fee for the defendant's attorney. *Id.*

The relevant factor in *Huckins* was the large down payment, one-third of the purchase price, which was retained under a very short contract. In this case, to make the Trustee's argument plausible one has to look at the original contract together with the superseding contract in 1991. Although there was a significant down payment under the first contract, approximately one-fifth of the purchase price, the time period before a balloon payment was five years, not three months. The property in this case was raw land, not residential real property. All of these factors make *Huckins v. Ritter* inapposite.

■ Given that a regularly conducted noncollusive forfeiture falls with the safe harbor, the Trustee has urged that the forfeiture was collusive, and therefore subject to attack. The Court finds that *First National Bank of Alamogordo v. Cape,* 100 N.M. 525, 673 P.2d 502 (1983), is instructive on the issue of collusion raised by the Trustee in the hearing

on remand.[1] In *Cape,* although the facts are extensive, there was fraud that was alleged because the vendee apparently requested the vendor forfeit the contract to keep it away from a third party claiming an interest in it. *Id.* at 527, 673 P.2d at 504. The fraud was determined when the vendee filed bankruptcy and the bankruptcy court held the debt was nondischargeable because of fraud. *Id.* However, this bankruptcy decision was not available to the trial court or New Mexico Supreme Court. *Id.* Therefore, the trial court and the New Mexico Supreme Court found that there was no convincing evidence of a conspiracy, and the forfeiture was otherwise proper. *Id.* at 528, 673 P.2d at 505. Similarly, in this case there is no persuasive evidence of collusion between the defendant and the debtor with respect to *Lot A.* There is some allusion to collusion with respect to Lots B and C. This hint of collusion can be seen in the termination agreement on Lots B and C. However, the termination agreement refers to an option to purchase, which the Court does not have the benefit of fully understanding because it was not introduced. As in *Cape,* there is no persuasive evidence of collusion.

■ Finally, the Trustee has urged throughout this case that the defendant received a windfall because of the equity in the property at the time of forfeiture. Although the enhancement in value of the property during the life of a real estate contract accrues to the purchaser, such interest does not survive a proper forfeiture. *See e.g., MGIC Mortgage Corporation v. Bowen,* 91 N.M. 200, 572 P.2d 547 (1977); *Russell v. Richards,* 103 N.M. 48, 702 P.2d 993 (1985). Additionally, appreciation of the property alone is not enough to shock the conscience of the Court. *Albuquerque National Bank v. Albuquerque Ranch Estates,* 99 N.M. 95, 105, 654 P.2d 548, 554 (1982).

For the foregoing reasons, the forfeiture of the real estate contract by the defendant does not shock the conscience of the Court. Therefore, the transfer is within the safe harbor described above and is not a fraudulent conveyance. There is no need for further analysis. This memorandum constitutes the Court's findings and conclusions pursuant to Federal Bankruptcy Rule 7052.

---

1. The defendants urge that the Trustee's evidence regarding the alleged collusive activities of the defendants and third parties should not have been allowed into evidence as it was beyond the scope of the "mandate", or beyond the magistrate's instructions on remand. This Court does not agree. The magistrate held that the rationale of *BFP v. Resolution Trust Corp.* applies "with equal force to situations involving a contract forfeiture." *R.J. McCanna II v. Burke,* 197 B.R. 333, 341. Because the Court must look at whether state law was followed, and if the procedures were noncollusive, and regularly conducted, it is appropriate for the Trustee to argue collusion.