# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 10, 2011      Decided January 17, 2012

No. 11-7021

REPUBLIC OF ARGENTINA,
APPELLANT

v.

BG GROUP PLC,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00485)

*Gabriel Bottini*, pro hac vice, argued the cause for appellant. On the briefs was *John P. Gleason*. *Fernando O. Koatz* entered an appearance.

*Alexander A. Yanos* argued the cause for appellee. With him on the brief was *Elliot Friedman*. *Paul L. Yde* entered an appearance.

Before: SENTELLE, *Chief Judge*, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The Republic of Argentina appeals the denial of its motion to vacate an arbitral award on the principal ground that the arbitral panel exceeded its authority by ignoring the terms of the parties' agreement. That agreement, in the form of a Bilateral Investment Treaty between the United Kingdom of Great Britain and Northern Ireland, and Argentina ("the Treaty"), provides that disputes between an investor and the host State will be resolved in the host State's courts. If, however, no final court ruling is forthcoming within eighteen months or the dispute is unresolved after a court ruling, the Treaty provides that resort may then be had to arbitration. BG Group, PLC, a British corporation and investor in Argentina gas companies pursuant to the Treaty, invoked the arbitration clause without first filing a claim in the Argentine courts. The arbitral panel nonetheless ruled it had jurisdiction, found Argentina had violated the Treaty, and awarded BG Group damages.

Although the scope of judicial review of the substance of arbitral awards is exceedingly narrow, it is well settled that an arbitrator cannot ignore the intent of the contracting parties. Where, as here, the result of the arbitral award was to ignore the terms of the Treaty and shift the risk that the Argentine courts might not resolve BG Group's claim within eighteen months pursuant to Article 8(2) of the Treaty, the arbitral panel rendered a decision wholly based on outside legal sources and without regard to the contracting parties' agreement establishing a precondition to arbitration. Accordingly, we reverse the orders denying the motion to vacate and granting the cross-motion to confirm, and we vacate the Final Award.

**I.**

The Bilateral Investment Treaty between the United Kingdom and Argentina was signed December 11, 1990, and became effective on February 19, 1993. It aimed to promote a

favorable investment environment between the contracting parties following Argentina's economic reformation to reduce inflation and the public debt. As relevant, Article 8(1) of the Treaty provides that disputes between an investor under the Treaty and the host State that "have not been amicably settled shall be submitted, at the request of one of the Parties to the dispute, to the decision of the competent tribunal of the Contracting Party in whose territory the investment was made." Article 8(2) sets the conditions by which such a dispute may be submitted to international arbitration:

> (a) if one of the Parties so requests, in any of the following circumstances:
>
>> (i) where, *after a period of eighteen months has elapsed* from the moment when the dispute was submitted to the competent tribunal of the Contracting Party in whose territory the investment was made, the said tribunal has not given its final decision;
>>
>> (ii) where the final decision of the aforementioned tribunal has been made but the Parties are still in dispute; [or]
>
> (b) where the Contracting Party and the investor of the other Contracting Party have so agreed.

Art. 8(2) (emphasis added). Article 8(3) provides that if, after three months from written notification of the claim, the parties to the dispute are unable to agree on one of the described arbitration procedures, then "the Parties to the dispute shall be bound to submit it to arbitration under the Arbitration Rules of the United Nations Commission on International Trade Law ["UNCITRAL Rules"]," although they can modify these rules.

Article 8(4) instructs that "[t]he arbitral tribunal shall decide the dispute in accordance with the provisions of this Agreement [i.e., the Treaty], the laws of the Contracting Party involved in the dispute, including its rules on conflict of laws, the terms of any specific agreement concluded in relation to such an investment and the applicable principles of international law."

Around the time the Treaty took effect, as part of its economic reformation, Argentina privatized the state-owned gas transportation and distribution company, *Gas del Estado,* and established a 1:1 fixed parity between the Argentine peso and the U.S. dollar. *Gas del Estado* was split into two transportation companies and eight distribution companies, one of which was MetroGAS. MetroGAS was granted a thirty-five year exclusive license to distribute gas in the city of Buenos Aires and portions of the surrounding metropolitan area, and the license provided that tariffs would be calculated in U.S. dollars and expressed in pesos. One provision of MetroGAS's license provided that adjustments to tariffs would be made every six months for inflation, in accordance with the United States Product Price Index ("PPI"). MetroGAS was entitled to review of its tariffs every five years to ensure reasonable returns. BG Group eventually acquired a 54.67 percent interest in Gas Argentino, S.A. ("GASA"), which in turn owned seventy percent of MetroGAS. In addition, BG Group invested directly in MetroGAS, and by 1998 held a 45.11 percent interest in MetroGAS.

The Argentine economy collapsed in late 2001 and early 2002 following, Argentina explained, the collapse of the Brazilian currency, a run on Argentine banks, and the withholding of a billion dollar loan installment by the International Monetary Fund. In response, Argentina enacted Emergency Law 25,561 on January 6, 2002, to terminate the currency board that had pegged the peso to the U.S. dollar, to

convert U.S. dollar based adjustment clauses in agreements to peso-based adjustment clauses, to prohibit inflation adjustments based on foreign price indices (e.g., the PPI), and to convert dollar-based tariffs into peso-based tariffs at a rate of one peso to one U.S. dollar. Argentina also established, by Resolution 308/02 and Decree 1090/02, a renegotiation process for public service contracts (excluding any licensee who sought redress in court or arbitration). And on March 2, 2002, Argentina adopted Decree 214/02, Article 12 of which stayed for 180 days the compliance with injunctions and execution of final judgments in lawsuits brought on account of the Emergency Law's effect on the financial system.

Eight months after the stay under Article 12 of Decree 214/02 had expired, BG Group filed a Notice of Arbitration, on April 25, 2003, pursuant to Article 8(3) of the Treaty. When it was unable to reach agreement with Argentina on an alternate forum, BG Group submitted to arbitration under the UNCITRAL Rules. As characterized by the Arbitral Panel, a ministerial opinion (appearing in an article by the former Argentina Attorney General and Minister of Justice) submitted by BG Group estimated that it would take six years to resolve BG Group's claim in the Argentine courts, and BG Group therefore viewed the requirement in Article 8(2) of the Treaty as "senseless," Final Award ¶ 142, and saw no reason to wait eighteen months before requesting arbitration. Alternatively, BG Group argued that customary international law did not require exhaustion of local remedies, and that Article 3 of the Treaty, the Most Favored Nation Clause, obviated the requirement that it seek recourse in Argentine courts given that Argentina's investment treaty with the United States lacked such a requirement.

The Arbitral Panel issued a Final Award on December 24, 2007, in Washington, D.C. The Panel determined it had

jurisdiction. It rejected BG Group's arguments that the dispute was arbitrable because an Argentine court would not resolve the dispute within eighteen months and that international law did not require exhaustion of local remedies. Instead, the Panel concluded that although BG Group did not seek recourse in Argentine courts for the eighteen month period required by Article 8(2) of the Treaty, that provision could not, "[a]s a matter of Treaty interpretation . . . be construed as an absolute impediment to arbitration." Final Award ¶ 147. Citing Article 32 of the Vienna Convention,[1] the Panel concluded that because Argentina by emergency decrees had restricted access to its courts and had excluded from the renegotiation process any licensee that sought redress, a literal reading of the Treaty would produce an "absurd and unreasonable result." *Id.* The Panel thus found it unnecessary to decide whether Article 3 of the Treaty made Article 8(1) and (2) inoperative.

---

[1] Article 32 of the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention"), provides that in interpreting a treaty:

> Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:
> (a) leaves the meaning ambiguous or obscure; or
> (b) leads to a result which is manifestly absurd or unreasonable."

Article 31 sets forth the "General rule of interpretation," stating in paragraph 1 that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

On the merits, the Arbitral Panel ruled BG Group had standing to bring its claim because, under the terms of the Treaty, it was an "investor" with an "investment"[2] (in GASA and MetroGAS), which suffered a decrease in the value as a result of the Emergency Law. It rejected BG Group's claim that Argentina had breached Article 5 of the Treaty or expropriated its investment in MetroGAS, because the decrease in the value of BG Group's investment was not permanent. It found, however, that Argentina had violated Article 2 of the Treaty by failing to provide fair and equitable treatment to investments,[3] in that its actions in the early 1990s led to BG Group's investment and by dismantling the regulatory scheme that induced the investment, "Argentina violated the principles of stability and predictability inherent to the standard of fair and equitable treatment." *Id.* ¶ 307. The violation was exacerbated, it found, by the exclusion of licensees seeking relief in an arbitral or other forum from the renegotiation process. The Panel rejected Argentina's state-of-necessity defense under customary international law, on the ground the defense was limited to exceptional circumstances, such as where there is a "serious and imminent threat and no means to avoid it." *Id.* ¶ 410 (internal quotation marks and citation omitted). Finally, the Panel

---

[2] Article 1(a)(ii) of the Treaty defines an "investment" to include "shares in and stock and debentures of a company and any other form of participation in a company, established in the territory of either of the Contracting Parties."

[3] Article 2(2) of the Treaty provides that "[i]nvestments of investors of each Contracting Party shall at all times be accorded fair and equitable treatment . . . . Neither Contracting Party shall in any way impair by unreasonable . . . measures the management, maintenance, use, enjoyment or disposal of investments in its territory. . . . Each Contracting Party shall observe any obligation it may have entered into with regard to investments of investors of the other Contracting Party."

awarded damages based on a comparison of two trades of BG Group's shares — one in 1998 (three and a half years before enactment of the Emergency Law) and one in 2002 (shortly after enactment of the Emergency Law) — extrapolating the value of BG Group's total investment and assessing the difference as the damages caused by the Emergency Law: $185,285,485.85 in U.S. dollars (excluding interest, costs, and attorneys' fees).

Argentina petitioned to vacate or modify the Final Award pursuant to the FAA, 9 U.S.C. §§ 10(a) & 11.[4] BG Group filed an opposition and a cross-motion for recognition and enforcement of the Final Award, and for a prejudgment bond. Following further filings in opposition or reply, the district court denied vacatur and granted enforcement. *Republic of Argentina v. BG Group PLC*, 715 F. Supp. 2d 108 (D.D.C. 2010); *Republic of Argentina v. BG Group PLC*, 764 F. Supp. 2d 21 (D.D.C. 2011). Argentina appeals; our review of the district court's findings of fact is for clear error and our review of questions of

---

[4] Section 10(a) of the FAA, 9 U.S.C. § 10(a), provides that an arbitration award may be vacated

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

law is *de novo*. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947–48 (1995); *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816 (D.C. Cir. 2007).

## II.

The "gateway" question in this appeal is arbitrability: when the United Kingdom and Argentina executed the Treaty, did they, as contracting parties, intend that an investor under the Treaty could seek arbitration without first fulfilling Article 8(1)'s requirement that recourse initially be sought in a court of the contracting party where the investment was made?  That question raises the antecedent question of whether the contracting parties intended the answer to be provided by a court or an arbitrator.

The Supreme Court has held that the intent of the contracting parties controls whether the answer to the question of arbitrability is to be provided by a court or an arbitrator.  *See, e.g.*, *First Options*, 514 U.S. at 943.  "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."  *Id*. at 944 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (alterations in original).  This comports with the "basic objective" of arbitration, which the Court explained "is not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms."  *Id.* at 947 (internal quotation marks and citations omitted).  Thus, in "construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties.'" *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 130 S. Ct. 1758, 1773–74 (2010) (quoting *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

In *Howsam v. Dean Witter*, 537 U.S. 79 (2002), the Court provided guidance on the circumstances in which a court, rather than the arbitrator, is to decide a "question of arbitrability," *id*. at 83. A court will decide the question

> in the kind of narrow circumstances where the contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

*Id.* at 83–84. In such circumstances, where "the parties did *not* agree to submit the arbitrability question itself to arbitration, then the district court should decide that question . . . independently." *First Options*, 514 U.S. at 943 (emphasis in original). If, on the other hand, there is clear and unmistakable evidence that the parties intended for the arbitrator to decide the question of arbitrability, a district court's review of the arbitrator's decision on that matter "should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate. . . . That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *Id.* (internal citations omitted).

The district court viewed Argentina as having conceded that the Treaty provided that the arbitrator would decide the question of arbitrability. It cited counsel's statement at the motions hearing that Argentina "'acknowledge[s] that the Arbitral Tribunal has the principal power to rule upon its jurisdiction.'" *Republic of Argentina*, 764 F. Supp. 2d at 33 & n.8 (quoting Tr., Sept. 28, 2010, at 4) (alteration in original). The context in which

counsel made this statement, and the subsequent colloquy with the district court, however, indicate that Argentina was conceding an altogether different point: once the Treaty's arbitration provision was properly triggered, after eighteen months' recourse to an Argentine court, any question of arbitrability *then* would be decided by the arbitrator. *See* Tr., Sept. 28, 2010, at 5. Indeed, in the sentence immediately following the one cited by the district court, Argentina's counsel stated: "However, we also understand that this Court has the right to and the duty to under the New York Convention to assess whether . . . Argentina's consent to arbitration [was] respected." *Id.* at 4. The transcript indicates this statement qualifies the previous sentence about arbitrability, rather than presents a new argument, because counsel next stated that the consent was "also" relevant to "whether the award is contrary or not to U.S. [public] policy," *id.*, a separate argument under the New York Convention.

Any concession by Argentina was thus limited to stating that the parties agreed the issue of arbitrability would be decided by an arbitrator if the aggrieved party had first sought relief in an Argentine court, pursuant to Article 8(1) and (2) of the Treaty. Indeed, its counsel made the point explicit in responding to the district court's next inquiry about whether the Treaty provided that the UNCITRAL Rules would apply if there were no agreement on an arbitral forum. *See id.* at 4–5. Argentina's counsel stated: "The fundamental issue[] here and that's our first objection is that [under the terms of the Treaty] Argentina's consent to arbitration had a very important condition. And that condition was that the dispute had to be submitted for 18 months to local courts to an Argentine judge." *Id.* at 5. The transcript thus demonstrates, when the statement by Argentina's counsel on which the district court relied is viewed in context, that the district court clearly erred in finding that Argentina had conceded that the arbitrator had the power to determine arbitrability under the circumstances.

A temporal analysis of the Treaty confirms this conclusion. Article 8(3) of the Treaty provides for the procedure to be followed once the possibility of arbitration is triggered, but only after an Argentine court first has an opportunity to resolve the dispute. Under Article 8(3), if the parties do not agree on an arbitration forum or procedure, the UNCITRAL Rules will govern resolution of the dispute; the UNCITRAL Rules grant the arbitrator the power to determine issues of arbitrability.[5] Thus, once Article 8(3) of the Treaty is triggered, the Treaty's incorporation of the UNCITRAL Rules provides "clear[] and unmistakabl[e] evidence," *AT & T Techs.*, 475 U.S. at 649; *see First Options*, 514 U.S. at 944, that the parties intended for the arbitrator to decide questions of arbitrability. *See Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 394 (2d Cir. 2011). But the Treaty's incorporation of the UNCITRAL Rules has a temporal limitation: the Rules are not triggered until after an investor has first, pursuant to Article 8(1) and (2), sought recourse, for eighteen months, in a court of the contracting party where the investment was made.

The Treaty does not directly answer whether the contracting parties intended a court or the arbitrator to determine questions of arbitrability where the precondition of resort to a contracting party's court pursuant to Article 8(1) and (2) is disregarded by an investor. By comparison, the Treaty states in Article 9(2) that should a dispute arise between the contracting parties themselves, the United Kingdom and Argentina, and it is not resolved through diplomatic channels, the dispute will go directly to arbitration. Article 9(5) provides that "[t]he [arbitral] tribunal shall determine its own procedure." This provision indicates that the contracting

---

[5]    Article 21(1) of the UNCITRAL Arbitration Rules, G.A. Res. 31/98, art. 21, para. 1, U.N. Doc. A/RES/31/98 (Dec. 15, 1976), provides that "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction" to hear the arbitration.

parties were aware of how to provide an arbitrator with the authority to determine a "question of arbitrability," *cf. BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994), and suggests that the absence of such language in Article 8(1) and (2) was intentional, *cf. First Options*, 514 U.S. at 945. It also underscores the importance the contracting parties ascribed to Article 8(1) and (2), counseling against a reading that would render its requirements inoperative.

Furthermore, the contracting parties likely never conceived of the need to specify that a *court* should decide whether Article 8(1) and (2)'s requirement that disputes first be brought to a *court* should be respected. The Treaty provides a prime example of a situation where the "parties would likely have expected a court" to decide arbitrability. *Howsam*, 537 U.S. at 83. It would be odd to assume that where the gateway provision *itself* is resort to a court, the parties would have been surprised to have a court, and not an arbitrator, decide whether the gateway provision should be followed. At the very least, there is no clear and unmistakable evidence, *see First Options*, 514 U.S. at 944, that the contracting parties intended an arbitrator to decide the gateway question.

Because the Treaty provides that a precondition to arbitration of an investor's claim is an initial resort to a contracting party's court, and the Treaty is silent on who decides arbitrability when that precondition is disregarded, we hold that the question of arbitrability is an independent question of law for the court to decide. *See id.* The district court therefore erred as a matter of law by failing to determine whether there was clear and unmistakable evidence that the contracting parties intended the arbitrator to decide arbitrability where BG Group disregarded the requirements of Article 8(1) and (2) of the Treaty to initially seek resolution of its dispute with Argentina in an Argentine court.

The Supreme Court's decision in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), does not require the opposite conclusion. In *John Wiley*, the Court drew a distinction between "substantive" questions of arbitrability and "procedural" questions of arbitrability, assigning the former to courts and the latter to arbitrators. *Id.* at 557. It did so in the context of an industrial labor dispute under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The premise underlying section 301 is a congressional policy favoring speedy arbitral resolution of labor disputes as an ongoing part of the collective bargaining process, to avoid the industrial strife that had historically led to labor strikes. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960). "[A]rbitration of labor disputes . . . is part and parcel of the collective bargaining process itself," *id.*, and thus "[t]he processing of disputes through [arbitration] is actually a vehicle by which meaning and content are given to the collective bargaining agreement," *id.* at 581. In the context of labor disputes, "judicial inquiry under [§] 301 must be strictly confined . . . . Doubts should be resolved in favor of [arbitration]." *Id.* at 582–83. Given this context, the *John Wiley* Court was concerned with "the delay attendant upon judicial proceedings preliminary to arbitration. . . . [S]uch delay may entirely eliminate the prospect of a speedy arbitrated settlement of the dispute, . . . contrary to the aims of national labor policy." *John Wiley*, 376 U.S. at 558.

The dispute between Argentina and BG Group arises in an entirely different context: an international investment treaty between two sovereigns. The provision at issue in the United Kingdom–Argentina Treaty, Article 8(1) and (2), illustrates why the reasoning in *John Wiley* is inapposite. The Treaty explicitly *requires* judicial proceedings prior to arbitration. That is, the contracting parties specifically desired "the delay attendant upon judicial proceedings preliminary to arbitration," *John Wiley*, 376

15

U.S. at 558, and the procedural/substantive arbitrability distinction drawn to accord with "the policy behind federal labor law," *id.* at 559, cannot be applied to a dispute over the operation of an international treaty provision that *requires* that which the Court in *John Wiley* sought to avoid. Furthermore, in *John Wiley*, the Court found it significant that the Union, not the arbitrator, questioned the operative relevance of the preconditions to arbitration in the collective bargaining agreement, because as a result the facts underlying the question of arbitrability "gr[e]w out of the dispute and b[ore] on its final disposition. *Id.* at 557. By contrast, as characterized by the Arbitral Panel, BG Group did not question its ability to commence a lawsuit in an Argentine court based on any of the decrees discussed by the Panel, but instead argued that a decision would not be rendered within eighteen months and thus it was "senseless" to adhere to the Treaty provision, Final Award ¶ 142. Unlike in *John Wiley*, here the facts underlying the question of arbitrability did not "grow out of the dispute" between BG Group and Argentina, but instead were raised *sua sponte* by the Panel. The question of arbitrabilty here precedes rather than grows out of the dispute.[6]

Because the Treaty provision at issue is explicit, the usual "emphatic federal policy in favor of arbitral dispute resolution,"

---

[6] *Howsam*, 537 U.S. at 82, 85, is also distinguishable because the question of arbitrability arose from a rule, promulgated by the National Association of Securities Dealers ("NASD"), that functioned as a six year statute of limitations. *Id.* at 82. The question of arbitrability thus was intertwined with the facts underlying the substantive dispute. The Supreme Court reasoned that the NASD arbitrators were "comparatively more expert about the meaning of their own rule, . . . [and thus] better able to interpret and to apply it." *Id.* at 85. Here, the question of arbitrability is separate from the underlying dispute, and the Treaty requirement to seek relief first in court was required by the contracting parties, not promulgated by the Arbitral Panel.

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), cannot function to override the intent of the contracting parties. It may be that parties generally negotiate arbitration clauses to "trade[] the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Id.* at 628. A court interpreting such a clause in the international trade context is informed by "a strong belief in the efficacy of arbitral procedures for the resolution of international commercial disputes and an equal commitment to the enforcement of freely negotiated choice-of-forum clauses." *Id.* at 631. In a case such as *Mitsubishi Motors*, this results in enforcing an agreement to arbitrate, which historically required "national courts . . . to shake off the old judicial hostility to arbitration." *Id.* at 638 (internal quotation marks and citation omitted). But where, as here, the contracting parties provided that an Argentine court would have eighteen months to resolve a dispute prior to resort to arbitration, a court cannot lose sight of the principle that led to a policy in favor of arbitral resolution of international trade disputes: enforcing the intent of the parties. "'[A]greeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting.'" *Id*. at 630 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 13–14 (1972)). Therefore, "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes requires that we enforce the parties' agreement." *Id.* at 629. Where the contracting parties agree to require dispute resolution in a court prior to arbitration, and the aggrieved party initiating the dispute disregards the requirement, a fundamentally different question of arbitrability arises than that of the ignored informal resolution steps in *John Wiley*. In keeping with the foundational principles expressed above, *see, e.g., Stolt-Nielsen*, 130 S. Ct. at 1774–75; *Howsam*, 537 U.S. at

83, a *John Wiley* assumption that the arbitrator is to determine the question of arbitrability cannot sensibly apply here.

Accordingly, "[b]ecause we conclude that there can be only one possible outcome on the [arbitrability question] before us," *Stolt-Nielsen*, 130 S. Ct. at 1770, namely, that BG Group was required to commence a lawsuit in Argentina's courts and wait eighteen months before filing for arbitration pursuant to Article 8(3) if the dispute remained, we reverse the orders denying the motion to vacate and granting the cross-motion to confirm the Final Award, and we vacate the Final Award.